## NATIONAL LABOR RELATIONS BOARD *v.* SANDS MANUFACTURING CO.

No. 274. Argued January 12, 1939.—Decided February 27, 1939.

---

*Mr. Charles A. Horsky*, with whom *Solicitor General Jackson*, and *Messrs. Charles Fahy, Robert B. Watts, Laurence A. Knapp*, and *Mortimer B. Wolf* were on the brief, for petitioner.

*Mr. Harry E. Smoyer*, with whom *Mr. Welles K. Stanley* was on the brief, for respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Circuit Court of Appeals denied the petition of the National Labor Relations Board for enforcement of an order against the respondent and granted the respondent's petition to set aside the order.[1] We issued the writ of certiorari because of alleged conflict.[2]

After complaint, answer, and hearing, the Board found that the respondent, an Ohio corporation which manufactures water heaters in Cleveland, had engaged, and continued to engage, in unfair labor practices as defined by § 8, subsections (1), (3), and (5) of the National Labor Relations Act,[3] and ordered the company to cease and desist from violating those provisions and to offer reinstatement to former employes with compensation for loss of wages from September 3, 1935.[4]

The respondent contends and the court below held that upon the findings of fact, and the uncontradicted evidence, the Board's conclusions are without support in the record. The petitioner insists that there is evidence to support them. From the findings, and the uncontradicted evidence, these facts appear: In the spring of 1934

---

[1] 96 F. 2d 721.

[2] See *Jeffery-DeWitt Insulator Co.* v. *National Labor Relations Board,* 91 F. 2d 134.

[3] Act of July 5, 1935, c. 372, 49 Stat. 449, 452; U. S. C. Supp. III, Tit. 29, § 158.

[4] 1 N. L. R. B. 546.

most of respondent's employes joined the Mechanics Educational Society of America (hereinafter called "Mesa"), an independent labor organization. The respondent manifested no opposition to their so doing, expressed its willingness that its men join any organization they chose, and readily met with a shop committee of the union to discuss grievances and working conditions. An agreement effecting an increase of wages, and affecting working conditions, was entered into between the respondent and the union. Although limited in term to sixty days it was continued, by mutual agreement, and under it all matters of controversy between employer and employes were settled by conference between the shop committee of the union and officials of the company.

In May 1935 the committee demanded, and the company refused, an increase of wages. A strike was called, but negotiations went on between the company and the union. All differences were adjusted save that the company was unwilling to reinstate certain men alleged to be incompetent. The union insisted that these men be taken back and thereafter be afforded a hearing by the management and the shop committee. When work was resumed the company did not permit the men in question to return. Thereupon a second strike was called. Negotiations again ensued as a result of which the shop committee agreed to draft and submit a contract to the respondent. This was done. The management demanded certain changes in the draft, to which the committee agreed; a contract extending to March 1, 1936, was executed on June 15, 1935, and the men returned to work. The agreement provided that the company would recognize the shop committee as representing the employes for collective bargaining; that no employe should be discharged without a hearing before the shop committee and the management; that certain employes should be discharged and not rehired; that stipulated

notice should be given of layoffs due to shortage of work; that new employes might join any labor organization they chose. It also covered wages and hours of work. It further provided: "In case of a misunderstanding between the management and the employes, the committee shall allow the management forty-eight hours to settle the dispute and, if then unsuccessful, the committee shall act as they see fit." Provisions as to seniority will be presently stated.

In 1934 the company had an opportunity to procure a government order. Its officers conferred with the men and stated that they would take the government order if assured that no labor trouble would interfere with its execution. On receiving this assurance the order was taken and the working force more than doubled by the employment of new men. It was agreed with the union that these men might joint the "Mesa" and in fact many of them did so. It was also agreed that when the government order was finished these new men should be discharged so that the old men could remain at work.

The company's plant was divided into a number of departments, one of which was the machine shop. The wage scales differed in different departments and the foremen and old men whom the company employed in each department received higher wages than new men in the same department. The company had had a practice of keeping the old men at work, in case business was slack, by transferring them from their own departments to others at their regular pay. When negotiations were under way for the agreement of June 15, 1935, the company insisted on discontinuing this practice of transferring old men from one department to another, stating that it would recognize, as theretofore, the seniority rights of old men but only in the departments in which particular men belonged. The management insisted that the practice of transferring men from one department to an-

other resulted in inefficiency. The Board has found that the company in fact disapproved of the practice because it resulted in paying higher wages than would have been the case had the new men been retained or recalled to the busy department instead of transferring old men from other departments thereto. As a result of the insistence of the respondent, certain paragraphs of the proposed draft submitted by the employes were altered. These paragraphs follow, with the alterations demanded by the management in italics:

"(5) That when employees are laid off, seniority rights shall rule, *and by departments.*

"(6) That when one department is shut down, men from this department will not be transferred or work in other departments until all old men *only* within that department, who were laid off, have been called back.

"(7) That all new employees be laid off before any old employees, in order to guarantee if possible at least one week's full time before the working week is reduced to three days."

On June 17, 1935, the company hired approximately 30 additional men, some of whom had worked for the respondent while the government order was being filled. By the middle of July work was becoming slack and respondent proceeded to reduce its working force. About July 15, 1935, after conferences between the management and the employees, all the men in the tank heater department except the foreman were laid off.

In the agreement of June 15, 1935, the 31 men who were employes of the respondent prior to the government order of 1934 were designated as "old men" and those employed while the government order was being filled. were "new men." About July 30, 1935, a notice was posted on the time clock in the plant that the new men would be laid off on July 30 and the old men would be laid off on August 2, 1935. After the layoff of the new

men another notice was posted to the effect that the plant would be operated with the old men on a schedule of three days a week.

Thus, by the end of July or the beginning of August, some departments were being operated on a part time basis and others had been practically shut down. At or about this time, the respondent wished to increase the working force in the machine shop, the key department, while at the same time shutting down the other departments. Repeated conferences were held between the management and the shop committee in reference to this matter. The positions of the respondent and the employes were diametrically opposed. The management contended that new men, experienced in machine shop work, be employed in preference to the old men. The shop committee contended that, under the agreement of June 15, 1935, the respondent could not hire any new men for the machine shop as long as old men were still laid off. The management claimed that the shop committee was insisting upon a violation of Article 5 of the agreement. On August 19th an officer conferred with the shop committee and announced that the company would either keep the machine shop running according to the company's plan or temporarily close the plant. The committee was requested to confer with the employes and communicate their decision. After conference with the employes the committee stated that the company would not be allowed to run the machine shop unless it transferred old men in lieu of new men to that shop, and that if it did not comply with this condition it could close the plant. Accordingly, on August 21st, notice was posted that the plant would be closed until further notice.

August 26th and 27th officers of respondent negotiated with the International Association of Machinists, an affiliate of the American Federation of Labor, and, on August 31st, made a contract with that union effective

September 3rd. It also recruited labor from the county relief organization. Practically all of the employes so obtained were members of the International. It offered reemployment to several of the old "Mesa" members, as foremen, on the basis of annual employment at a lower hourly wage instead of the higher hourly wage theretofore paid them, subject to layoffs. The offer was refused. September 3rd the plant reopened. On September 4th, a representative of "Mesa" called an officer of respondent and demanded a conference. The demand was refused on the ground that the men had been discharged. The "Mesa" picketed the plant for about a month thereafter.

The Board held that the company had refused to bargain collectively with the representatives of its employes as required by § 8 (5) of the Act; had discriminated in regard to hire or tenure of employment and discouraged membership in a labor organization contrary to the provisions of § 8 (3); and, in violation of § 8 (1), had interfered with, restrained, and coerced its employes in the exercise of the right of self-organization, affiliation with labor organizations and collective bargaining as guaranteed by § 7. The Circuit Court of Appeals disagreed with these conclusions. We hold that its decision was right.

*First.* The petitioner urges the correctness of the ultimate conclusion that the respondent's conduct permits no reasonable inference save that the employes were locked out, discharged, and refused employment because they were members of the "Mesa" and had engaged in concerted activities for the purpose of collective bargaining. We think the conclusion has no support in the evidence and is contrary to the entire and uncontradicted evidence of record.

The respondent did not attempt to prevent organization of its employes or discourage their affiliation with "Mesa" or interfere with their relations with that body. There is no evidence of espionage or coercion by the com-

pany. Immediately upon the unionization of the men in the spring of 1934, the respondent recognized and conferred with the shop committee whenever requested so to do. May 2, 1934, it entered into an agreement with the union. It consulted the union respecting hiring of additional employes for the filling of the government order in the autumn of 1934 and complied with its promise to discharge additional men hired for this purpose when the order had been completed. All but three of the men hired became members of "Mesa" without objection on the part of the company. From May 1934 to May 1935 the company negotiated with the union and the latter never had any trouble in getting meetings with the management. When, in 1935, a strike was called as a result of the refusal of the shop committee's demand for a wage increase, the company continued negotiations during the strike and made an oral agreement under which the strikers returned to work. When three days later they struck again because of a refusal to reinstate some of their number, although a representative of "Mesa" said several of these men might be incompetent, the company took the men back and continued to negotiate with the union with the result that a draft of a contract was submitted by the shop committee. After the company had insisted on certain changes with respect to departmental seniority, the draft ripened into a contract June 15, 1935.

Thereafter the respondent had hearings with the shop committee as to the discharge of an employe for incompetence and there is no suggestion that, between June 15th and August 21st, it failed to live up to its contract in any respect. Repeated meetings were held with the shop committee to discuss the terms of the contract respecting departmental seniority. The evidence of the members of the shop committee demonstrates that this matter was fully discussed before the contract was executed and that the members of the committee under-

stood the company's position and the reason for the alterations in the committee's draft. Throughout the summer of 1935 the company, while adhering to its position, attempted to accommodate its practices to the demands of the shop committee, evidently in order to avoid a strike. When the final conference of August 19th took place the company's manager made it clear to the committee that he desired to operate the machine shop with the new men belonging in that department and when the committee advised him this would not be permitted he asked them to go to the men and find out whether the proposed operation would be permitted or whether the plant would have to be shut down. On August 21st the committee brought back a reply to the effect that the company could shut down the plant but could not operate the machine shop on the principle of departmental seniority. The company then closed the plant and did not open it until it had employed new men under a contract with another union which gave it the option to enforce departmental seniority. Save for one item of evidence, this is all the record discloses to indicate that the discharge and replacement of the men arose from a discrimination against them for union activities and the exercise of the right of collective bargaining. Manifestly it is not only insufficient to sustain any such conclusion but definitely refutes it. The Board supports the conclusion by reference to the testimony of two men. One, Norman, who was, with the union's consent, discharged after the agreement of June 15, 1935, for incompetency, testified he thought he was discharged as a result of a grudge. He said that in June, one McKiernan, a shipping clerk who was his superior, told him when he complained about his discharge: "I will tell you; there is a lot more of this than you and I know of . . ." "I will get you back when we break this union up . . ." There is the further testimony of

a witness Rudd who says that the superintendent said to him in June, in effect, that it would be better to have the A. F. of L. union as they were more conservative and not so likely to strike. This was just after "Mesa" had called two strikes in the plant. Neither of the men who are quoted held such a position that his statements are evidence of the company's policy even in June, two months before the discharge, and the inference of hostility to "Mesa" drawn from their testimony does not, in any event, amount to a scintilla when considered in the light of respondent's long course of conduct in respect of union activities and in dealing freely and candidly with "Mesa."

*Second.* The Board held that respondent violated the obligation imposed upon it by the statute to bargain collectively with representatives of its employes. The legislative history of the Act goes far to indicate that the purpose of the statute was to compel employers to bargain collectively with their employes to the end that employment contracts binding on both parties should be made.[5] But we assume that the Act imposes upon the employer the further obligation to meet and bargain with his employes' representatives respecting proposed changes of an existing contract and also to discuss with them its true interpretation, if there is any doubt as to its meaning. Upon this basis the respondent was not deficient in the performance of its duty.

The contract provided for departmental seniority, in §§ 5 and 6, and § 7 did not create any ambiguity on the subject. Moreover, the record makes it clear that the committee which negotiated the contract on behalf of the union fully understood its terms in the same sense as did the respondent. In this situation how often and

---

[5] Report No. 573 of Senate Committee on Education and Labor, 74th Cong., 1st Sess., p. 12.

how long was the company bound to continue discussion of the committee's demand that the provisions of the contract should be ignored? It is to be borne in mind that § 20 of the contract provided that if the company did not meet the committee's views within forty-eight hours the employes reserved full liberty of action and this meant that if the company did not accede to demands a strike might follow.

We come then to consider the situation of the respondent in August 1935. The Board has found that it desired to operate its machine shop in accordance with its honest understanding of the contract. Its motive, whether efficiency or economy, was proper. It had stated its views to the committee. The committee was adamant; its stand was that the company could close its entire plant if it chose, but it could not operate the machine shop in accordance with the provisions of the contract. If it attempted the latter alternative a strike was inevitable. The Board found that it was inconceivable that the employes would have accepted the company's construction of the contract even if they had been threatened with discharge at the time. It is evident that the respondent realized that it had no alternative but to operate the plant in the way the men dictated, in the teeth of the agreement, or keep it closed entirely, or have a strike. When the representatives of the two parties separated on August 21, no further negotiations were pending, each had rejected the other's proposals, and there were no arrangements for a further meeting. On the following days the factory was closed.

The Board finds that, in this situation, the respondent was under an obligation to send for the shop committee and again to reason with its members or to wait until the situation became such that it could operate its whole plant without antagonizing the employes' views with respect to departmental seniority. We think it was under

no obligation to do any of these things. There is no suggestion that there was a refusal to bargain on August 21st. There could be, therefore, no duty on either side to enter into further negotiations for collective bargaining in the absence of a request therefor by the employes.[6] No such request was made prior to September 4th. Respondent rightly understood that the men were irrevocably committed not to work in accordance with their contract. It was at liberty to treat them as having severed their relations with the company because of their breach and to consummate their separation from the company's employ by hiring others to take their places. The Act does not prohibit an effective discharge for repudiation by the employe of his agreement, any more than it prohibits such discharge for a tort committed against the employer.[7] As the respondent had lawfully secured others to fill the places of the former employes and recognized a new union, which, so far as appears, represented a majority of its employes, the old union and its shop committee were no longer in a position on September 4th to demand collective bargaining on behalf of the company's employes.

It is urged that the company's offer to re-employ four men as foremen on the basis of guaranteed annual compensation, at a lower hourly rate than had theretofore been paid them, is evidence to support the Board's finding of a refusal to bargain collectively with the union. The argument is that if the company had made a similar offer to all of the men this might have formed a basis of compromise, since one of the employes to whom an officer talked indicated that the men might be willing to take a cut in wages; but there is no evidence that the

---

[6] Compare *National Labor Relations Board* v. *Columbian Enameling & Stamping Co., ante,* p. 292, 298–299.

[7] Compare *National Labor Relations Board* v. *Fansteel Metallurgical Corp., ante,* p. 240, 254ff.

company had any thought of offering a similar contract to others than the foremen of departments, and the breach of contract of which the men were guilty left the company under no obligation to initiate negotiations for a new and different contract of employment with them.

*Third.* Certain occurrences subsequent to August 21, 1935, are urged by the Board in support of its finding that respondent's discharge of its forty-eight employes constituted discrimination against the union and failure to bargain collectively. The first of these is its application to the International Association for men and its making an agreement with that union on August 26th and 27th. If, as we have held, the respondent was confronted with a concerted refusal on the part of "Mesa" to permit its members to perform their contract there was nothing unlawful in the company's attempting to procure others to fill their places.[8] If the respondent was at liberty to hire new employes it was equally at liberty to make a contract with a union for their services.[9]

The offering of re-employment to four of the old employes, upon a new and different basis, is said to constitute discrimination against "Mesa," but the answer is that if the whole body of employes had been lawfully discharged the law does not prohibit the making of individual contracts with men whose prior relations had thereby been severed.[10]

*Fourth.* The Board found as a fact that in offering re-employment to two of its old men the respondent stipulated as a condition that they join the International

---

[8] Compare *National Labor Relations Board v. Mackay Radio & Telegraph Co.,* 304 U. S. 333, 345.

[9] Compare *Consolidated Edison Co. v. National Labor Relations Board,* 305 U. S. 197, 236–237.

[10] Compare *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 U. S. 1, 44, 45; *National Labor Relations Board v. Fansteel Corp.,* ante, p. 240, 259.

union. The finding is sharply challenged but, as there is evidence in support of it, we accept it. Based upon this finding the Board contends this stipulation in connection with the offer to hire the men was a violation of § 8 (3) of the Act independent of any of the violations flowing out of the discharge and refusal to re-employ the men as a body. The contention is irrelevant to any issue in the cause. The complaint alleges that the discharge of the men constituted an unfair labor practice in violation of § 8 (1) and (3) and that the execution of the agreement with the international association constituted an unfair labor practice under § 8 (5). It nowhere refers to any discrimination in hiring any man or men or charges any violation in connection therewith.

The decree is

*Affirmed.*

Mr. Justice Black and Mr. Justice Reed dissent.

Mr. Justice Frankfurter took no part in the consideration or decision of this case.