**W. L. MEAD, Inc.**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, etc., LOCAL UNION NO. 25, A.F.L.**

**Civ. A. No. CA-54-797-A.**

United States District Court,
D. Massachusetts.
March 17, 1955.

Bernard B. Gould, Boston, Mass., and Daniel J. Buckley, Jr., Arlington, Mass., for plaintiff.

Stephen J. D'Arcy, Jr., Boston, Mass., for defendant.

ALDRICH, District Judge.

This case of a strike against a motor carrier engaged in exclusively interstate transportation of commodities between points in Ohio and Springfield, Massachusetts, Boston, Massachusetts and Providence, Rhode Island, has twice been before this court. The first was in denying a preliminary injunction, D.C., 125 F.Supp. 331, affirmed 1 Cir., 217 F.2d 6; and the second in determining the defendant's liability for damages, D.C., 126 F.Supp. 466. Before now assessing these damages, it would be well to fix certain dates and events.

On the morning of Friday, September 10, 1954 the defendant, in what I have found to be a breach of its collective bargaining contract, refused a request to arbitrate thereunder and called all its men off the job at Boston because of a dispute over the hours and working conditions of one Smith. These men immediately began picketing the Boston terminal. Thereafter the plaintiff discharged them. This was for not returning to work, and for picketing and was, I have found, an entirely proper act on its part. On September 13th the plaintiff wrote the defendant requesting

twenty new men, pursuant to Article I of the agreement. It also appealed to the State Department of Labor and Industries to try to terminate the work stoppage.

On September 14th the defendant offered at a conference before a State Labor conciliator to return the original twenty men and arbitrate the question of Smith before the State Labor Board. This was refused. The plaintiff said Smith was discharged and that it would not arbitrate him before anybody. At the same time the plaintiff offered to take back a substantial number of the original men, but as new employees. It did not say how many it meant, and the defendant did not inquire. The defendant said all must go back. On September 17th the plaintiff lodged charges against the defendant before the National Labor Relations Board, and the defendant alleged counter-charges. On September 20th the defendant offered in writing to return the original twenty men and to arbitrate the question of Smith before Judge Coddaire, the seventh, or independent, member of the contractual panel. This offer was not accepted. On September 29th the defendant called off the men in the plaintiff's Springfield terminal, and on September 30th at Providence.

On October 11th the plaintiff brought this suit. On October 14th there was another meeting before a State Labor conciliator. There is a dispute as to what took place. The defendant's representative testified that the defendant abandoned its request to arbitrate Smith and offered to return the original twenty men "with no strings attached," or "un-conditionally." He admits that he did not explain what these terms meant, but says that the plaintiff did not indicate any interest, or inquire. The plaintiff denies that any such offer was made. A witness called by the defendant to corroborate the making of this offer conceded that its meaning was not abundantly clear to him. It is open to me to find that the so-called unconditional offer was made, or that it was not made, or, perhaps, that it was not made clearly enough.

On October 15th, the next day, there was a hearing before me on the plaintiff's motion for a preliminary injunction. In view of the fact this motion was based on the defendant's allegedly continuing wrongful conduct, and that defendant's counsel was the same person who allegedly made the unconditional offer the day before, I note with some interest that the defendant did not tell me about that offer, although it spoke in detail about some less substantial offers.[1] Thereafter the defendant filed a complaint before the Joint Committee. When this came on for hearing on October 29th the plaintiff declined to proceed because, it said, it had no employees.

On November 1st there was a repetition of the October 14th conference before a State conciliator. The testimony was the same. Again, the defendant now says, it made an unconditional offer to return all the men as new employees. The following day it filed its answer in this court. Again it is interesting to note that the answer contained no mention of unconditional offers on either October 14th or November 1st, although

---

1. The defendant's counsel said, "We could do nothing more in attempting to comply * * * than to offer to arbitrate * * *. As late as yesterday we offered to arbitrate. * * * We offered to send the men back to work." Nothing was said about waiving the demand for arbitration, or sending the men back "without strings," i. e. unconditionally, as new employees. The defendant's counsel was an intelligent man, experienced in labor matters, who knew how to express himself.

On December 21st this same counsel testified under oath that October 14th was his first conference with the plaintiff; that he had then offered to send the men back "without strings;" that this meant as "new employees," and that "arbitration of the original dispute had been forgotten." I am unable to reconcile this testimony with what he told me on October 15th.

it did set out with particularity the much less substantial offers of September 14th and September 20th (erroneously identified as September 17th).

There was admitted in evidence, offered by the defendant for the limited purpose of showing "what the defendant told the N.L.R.B." a complaint filed on November 12, 1954 by the Regional Director, Paragraph 8 of that complaint alleges that "On or about October 14 and November 1, 1954 the employees named * * * applied for reinstatement to their former or substantially equivalent positions". For what it is worth I do not construe this as meaning they applied to go back without strings, as new employees.

On November 10th the defendant filed a motion for specific performance of the agreement to arbitrate. On November 18th or 19th the plaintiff offered to take all the men back,[2] not merely as new employees, but as old employees, provided the defendant would drop its charges before the National Labor Relations Board. The defendant refused. On November 22nd the defendant's motion for specific performance was heard and denied. At that hearing I heard for the first time that the defendant claimed to have made oral offers on October 14th and November 1st to return the men "with no strings attached." The plaintiff immediately denied this.

On all the evidence I conclude without hesitation that the defendant did not make unconditional offers on October 14th and November 1st. I find that the defendant never made any offer to per-

form that was any more substantial than its offer on September 14th, and that so far as the plaintiff's alleged duty to mitigate damages by accepting the defendant's offers is concerned, the case must stand or fall on what transpired that day.

■ I do not find that, as now contended by the defendant, the plaintiff had a duty to arbitrate the strike. The defendant, having broken its contract and gone on strike because it refused to arbitrate an individual dispute, is not in a position to contend that the plaintiff should then have insisted on arbitrating the strike as well.[3]

I will review the occurrences of September 14th. The defendant's position was that the plaintiff must take back all of the men in their original status with seniority, etc., Smith to have temporarily his new and inferior position, and the question of this reduction to be arbitrated before "anyone agreeable to both parties." I find that this phrase under the circumstances meant immediate arbitration before anyone the defendant thought suitable other than the contractual Joint Committee.[4] The plaintiff's position was, Smith is no longer an employee; therefore there was nothing to arbitrate about him. It would take twenty new men from the defendant, and it would include in that number an unspecified, but substantial number of its former employees. Each party was unwilling to explore the other's offer, because neither would concede any further.

---

2. With the exception of two men who had criminal involvements, whom the defendant did not then, apparently, insist upon.

3. It is not necessary to reach the question of whether a strike was arbitrable matter under the contract. Markel Electric Products, Inc., v. United Electrical, etc., Workers, 2 Cir., 202 F.2d 435; cf. International Union, United Furniture Workers of America v. Colonial Hardwood Flooring Co., 4 Cir., 168 F.2d 33, 35.

4. I find that even though by September 14th plaintiff had lost interest in arbitrating Smith at all, on September 10th it cared very much, and had a right to care, before whom it arbitrated. The possible unavailability of the Joint Committee was no fault of the plaintiff's. Other employers and employees equally dependent upon the Committee could and did wait, and there was nothing about the instant dispute which required extraordinary haste. The identity of the arbitrators was of importance. Furthermore, in all matters of labor relations principle, less accurately, face, is very important.

■ The defendant, in its brief, asks what right the plaintiff had to insist on a different standard of performance than it was entitled to prior to September 10th. This whole misconception, if it can be called that, apparently actuated the defendant from the outset. A man who in violation of his contract walks off the job and pickets the plant without excuse, can not return when he wishes and call the tune that he chooses. The men who left their employment were lawfully discharged by the plaintiff. N. L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; In Matter of United Elastic Corp., 84 N.L.R.B. 768. The defendant under its collective bargaining contract did not have, prior to September 10th, the right to tell the plaintiff which of its members were to fill vacancies. On the contrary, the plaintiff could select, and if it did not choose any, it could take non-union men, provided they applied for membership in 30 days. However, the defendant after September 10th, at a time when it was in default under its contract, not only insisted on which of its members the plaintiff should employ to fill the vacancies then existing, but took what steps it could to see that if the plaintiff did not accept the defendant's selections, and on the defendant's terms, it should have no one.[5] The plaintiff was not insisting on rights which it did not have,—the defendant was.[6]

The defendant says repeatedly that if its strike on September 10th was unlawful, it became lawful on September 14th because "the employees were then striking to get their jobs back." They were not then entitled to get their jobs back on their own conditions. The picketing and interference on September 15th was just as unlawful as it was on September 10th.

During the course of the trial I took evidence in certain alternative forms in case I should conclude that at some point prior to December 9, 1954, when the strike actually terminated, the plaintiff failed in its duty to mitigate damages, or that something else occurred that should be treated as a cut-off. I now find and rule that there was no such occurrence, and that the defendant is liable, under applicable principles, for all appropriate damages resulting from its wrongful activities as aforesaid.

■ The consequences of a strike which is at all prolonged in the motor freight transportation business are very serious. It is not unlike a strike in a barber shop. Customers cannot and do not wait for service until the strike is settled; they go elsewhere. Business lost during the strike is irretrievably lost. Furthermore, even more than with a barber shop, competition is not on price. Uniform rates are set and enforced by the I.C.C. Customers who go elsewhere may find no reason to return. The plaintiff prides itself on rendering particularly fast service. It has considerable competition, however. I cannot believe it has a monopoly on speed to the extent that everyone prefers its services, or presumably, all this competition would not have existed, or continued to exist. Nor is it such a personal business that there is any great pressure on customers to come back at the earliest opportunity, unless they are

5. I find that the defendant's activities during the strike were calculated to and did in fact prevent the plaintiff from hiring non-union or other employees in spite of reasonable attempts on its part to do so.

6. It might be argued that the defendant's actions of September 10th constituted a total breach, and that the plaintiff could no longer "insist" on any men. This argument would defeat itself—as the defendant would then be liable for total breach. In either event, the plaintiff's willingness to take men on September 13th was to the defendant's advantage, as giving the defendant an opportunity to mitigate damages—which opportunity the defendant rejected by insisting on rights which it did not possess. No doctrine of waiver of breach assists the defendant. A person who benefits by a waiver cannot insist that the waiver be on such terms as *it* chooses, unless there was an agreement, implied or otherwise, to such effect. I find neither party thought the plaintiff was waiving any rights.

affirmatively dissatisfied elsewhere. On the contrary, I believe the testimony that the plaintiff, at the end of the strike, was faced with a long and hard and probably expensive selling job; that most business would come back only by degrees, and that some of it would never return. If the strike had been a short one, things would have been different. It was not; it was the defendant's fault that it was not; these losses were natural and foreseeable to anyone acquainted with the business, and the defendant was well acquainted.

The damages may be divided into two parts; damages during the strike, and prospective damages thereafter.[7] Damages during the strike consist of loss of profits, plus the actual cost of operation, or of standing by, during the interval. This I further subdivide by reason of the fact that the strike was limited to Boston during September and the plaintiff was able to do a partial, but lopsided business through Springfield and Providence until the defendant shut down those terminals on September 29th and 30th. Although there was no strike in Ohio, the plaintiff's business was solely interstate, so that the shut-down of the eastern terminals closed it entirely.

I find that from September 10th to September 30th the plaintiff operated at a net loss of approximately $20,000. I find that but for the strike it would have made a net profit, before taxes, of $15,000. It is not possible to find this with mathematical accuracy, but I am confident it would have been at least that because, among other things, the I.C.C.

allowed rate changes which in effect resulted in a general increase in rates on September 4, 1954, of about 9% on a weight basis. There was testimony, which was not rebutted,[8] that a rate increase such as this would not drive the business elsewhere, or reduce it so far as this plaintiff was concerned, so that the increase would be directly felt and enjoyed. I see no reason to disbelieve this testimony. I am reasonably satisfied that the plaintiff's damages for the month of September were, accordingly, $35,000.

From October 1, to December 9, the date the strike terminated, the plaintiff's fair allocable cost or expense of standing by was at least $700 a day. I have adjusted a few fixed costs on this, notably Rhode Island workmen's compensation, and straight line truck etc. depreciation, which I believe excessive, and have eliminated a few items. Had there been no strike, the plaintiff's profits, before taxes[9], would also have been approximately this same figure. I therefore find plaintiff's damages for this period to be $96,000.

The plaintiff is further entitled to the consequential damages to its business which, though the strike was terminated, are its natural foreseeable consequences. The plaintiff's president testified that from and after December 9 the operations would not reach a break-even point for about six months. In view of the fact that unbalanced operations in September, when one terminal shut down, resulted in tremendous operational losses, and in the light of the testimony as to the length of time it may be ex-

---

7. No one has contended that I should find actual damages to the date of the suit, and prospective damages thereafter, and since the strike was settled during the trial I will find actual damages until that later date, and prospective damage thereafter. Cf. Eastern Paper & Box Co. v. Herz Manufacturing Co., 323 Mass. 138, 145, 80 N.E.2d 484; Cutter v. Gillette, 163 Mass. 95, 39 N.E. 1010. If the defendant wishes to make a point of this, I will permit an amendment under Rule 15(d), Fed.Rules Civ.Proc. 28 U.S.C.

8. The defendant offered no evidence of any kind on damages, although it had ample opportunity.

9. The defendant suggested that I should take net after taxes. In view of the fact that the plaintiff's recovery in the form of lost profits will constitute gross income for tax purposes, cf. Raytheon Production Corp. v. Commissioner, 1 Cir., 144 F.2d 110, certiorari denied 323 U.S. 779, 65 S.Ct. 192, 89 L.Ed. 622, I do not adopt that suggestion.

**318**

pected to take to get custom to return, I believe that further large losses are in store, not to mention loss of profits. Damages for the combination of those two, for that period, I find to be $228,-000.[10]

A word about plaintiff's exhibits on damages. The plaintiff, because of the nature of its business, possessed extensive books and records. It brought to court detailed compilations and figures on which it was closely examined and cross-examined from its original records. I find that all the figures which were taken, as amended by the plaintiff's testimony from the records are true and accurate so far as material, and, in turn, that the records were also.

At the conclusion of the examination I admitted some of these exhibits, stating, as the defendant correctly paraphrased in its brief that this was "without prejudice to the inadmissability of any of the items therein contained," that I would reserve my final rulings and make any individual rulings on materiality that were requested. In particular I asked for motions that any individual items be not considered.

The defendant moved in its brief—a proper place to do so—that I do not consider any so-called "fixed expenses." I deny that motion.

Apart from that the only other request the defendant made was that I strike out all those exhibits in toto because the inclusion of certain items proved that the entire exhibits were "unreliable and inadmissible." I deny that

motion as to Exhibits 7, 9, 11 (through August, 1954) and 16. I do strike out Exhibits 8, 10, 12, 13, 17, 18 and 19, which are more in the nature of chalks or argument.

Under the above circumstances I do not feel called upon to make the detailed rulings upon individual items as I originally offered to do. I have reduced certain items as above stated, to properly chargeable stand-by expenses where those were being considered. However, such items were not at all large. I have found that substantially all of the items claimed by the plaintiff were fair and reasonable and properly chargeable. The plaintiff was, (and even upon receipt of this opinion still may be) far from certain that it was to recover damages from this defendant, and I find, if only from self-interest, it acted at all times to keep expenses to a minimum consistent with being able and ready to resume operations on a reasonable basis as soon as the strike was settled.

It was proper for the plaintiff to attempt to maintain, at least on a stand-by basis, employee relationships, customer relationships and trade relationships, plant and equipment, and there were many items it could not avoid unless it wound up its business. Naturally it was not called upon to do that. Indeed, it was to defendant's advantage that it did not.

Judgment will be entered for the plaintiff in the amount of $359,000. The counterclaim is dismissed.

10. The comparison of this figure with the sum of $250,000 testified to by plaintiff's president as the injury of its good will, while interesting, is entirely coincidental. I have given nothing for good will, because I believe it would result in duplication. I might add in connection with this finding, as with the others, that the evidence offered by the plaintiff would justify a larger amount. The reason I have not allowed any larger amounts is not that I affirmatively disbelieved any particular testimony offered by the plaintiff, but that I have recognized that the burden of satisfying me that every portion of its claim was probable, as distinguished from speculative, was upon it. I have endeavored to apply a skeptical approach, particularly with relation to damages after December 9th. That this evidence was not too speculative, cf. Standard Machinery Co. v. Duncan Shaw Corp., 1 Cir., 208 F.2d 61.