**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**TRUITT MANUFACTURING COMPANY, Respondent.**

**No. 6989.**

United States Court of Appeals Fourth Circuit.

Argued June 15, 1955.

Decided July 30, 1955.

---

Duane Beeson, Atty. National Labor Relations Board, Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, Chicago, Ill., David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Frederick U. Reel, Atty., National Labor Relations Board, Washington, D. C., on brief), for petitioner.

R. D. Douglas, Jr., Greensboro, N. C., and Whiteford S. Blakeney, Charlotte, N. C. (Douglas, Douglas & Ravenel, Greensboro, N. C., and Pierce & Blakeney, Charlotte, N. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition to enforce an order of the National Labor Relations Board which found the Truitt Manufacturing Company guilty of an unfair labor practice in refusing to bargain with a union representing its employees in that, although bargaining with respect to all matters as to which it was asked to bargain, the company refused a request of the union that it allow an accountant to examine its books and records for the purpose of ascertaining whether it was financially able to grant the wage increase demanded by the union. The Board held that because the company had represented in the course of bargaining negotiations that it was not able to pay the wage increase demanded, a refusal to comply with the request of the union amounted to a refusal to bargain in good faith. The company contends that it bargained in good faith, and that it was not required to disclose to the union, as an incident of such bargaining, the books and records. showing its financial condition and involving confidential matters such as manufacturing cost which it would be harmful to its business to make public. We think that the position of the

company is correct and that it may not be held guilty of an unfair labor practice because of refusal to furnish such information to the union or to allow its books and records to be examined at the union's request.

The facts are that the company had duly recognized the union as the bargaining representative of its employees and had been bargaining with it for a period of three years. In the summer of 1953, the union made demand for a 10 cents per hour increase in wages and representatives of the union and the company met and negotiated with respect to the matter. The company offered a 2½ cents per hour increase and the union called a strike which lasted for a week. After the strike was ended the union renewed its demand for the 10 cents increase, and the company again refused to accede to the demand but granted a 2½ cents raise, which was put into effect. During the course of these negotiations, the company made statements on a number of occasions to the effect that it could not afford a 10 cents increase, that it was paying wages as high or higher than competitors and that it had lost contracts to lower bidders because of bids based on the wages that it was paying. The union asked to see its books and records in substantiation of these statements. The company offered to produce all records relating to bids and wages paid but refused to permit examination of its books and records with respect to other matters. The letters of the union making the first demand was a letter of September 2, 1953, which contained the following paragraph:

"Representatives for the Truitt Mfg. Company have claimed, during our lengthy negotiations, the inability to grant an increase in excess of two and one-half (.02½c) cents per hour, therefore Shopmen's Local Union No. 729 respectfully requests permission to have a certified public accountant examine such books, records, financial data, etc. to ascertain or substantiate the Company's position or claim of being unable to meet the Union's proposal and/or counter proposals of a wage increase in excess of two and one-half (.02½c) cents per hour."

Counsel for the company in a letter of September 4, 1953, said in answer to this:

"I have been authorized to state to you that the Company takes the position that confidential financial information concerning the affairs of this Company is not a matter of bargaining or discussing with the Union. The Company's position throughout the recent negotiations and in previous sessions with you and the Union, has been that the question of granting a wage increase concerns our competitive bidding for jobs to keep the plant operating.

"We have endeavored to point out to you that the average wage of Truitt Manufacturing Co. is already higher than the average wage of all our competitors in this area. We have stated many, many times that in bidding for contract work, our bids must be made on the basis of what the labor will cost to perform these jobs and that we simply cannot get the work if our labor costs used in our estimates are higher than those of our competitors. The Union committee has persistently ignored our comparative rates, has made no answer to our exhibits of how we compare with our competitors, and has continued to ask for higher pay, on the grounds that the employees need it, and that we are under the general average of the 'Industry', which you apparently define as being all steel plants in the United States.

"We will be glad at any time to show you our books and records regarding the wages we pay to our employees whom you represent, although we think you have this information already."

In reply to this letter the union under date of September 14, 1953, wrote a

letter repeating its demand in the following language:

"If the Company still contends that it cannot afford to grant the wage increase of ten cents (10c) per hour requested by the Union, we respectfully request that the Company submit full and complete information and evidence of its financial status to substantiate its claim, including bonafide evidence as to dividends paid by the Company during the past ten (10) years and the breakdown of its manufacturing costs."

It was failure to comply with these demands which the Trial Examiner and the Board held to be refusal to bargain in good faith. The basis of the conclusion by the Examiner was stated by him as follows: "An employer cannot refuse a demanded wage increase on the grounds that such increase would put him out of a competitive position, even though he were paying the prevailing area wage scale, unless he factually documents this conclusion." The Board refused to adopt this holding of the Trial Examiner but held that: "When an employer seeks to justify the refusal of a wage increase upon an economic basis, as did the Respondent herein, good faith bargaining under the Act requires that upon request the employer attempt to substantiate its economic position by reasonable proof." The Board was, of course, clearly right in rejecting the holding of the Trial Examiner. We think it equally clear that the Board was wrong in holding that good faith bargaining under the act requires that an employer substantiate its economic position by submitting its books for examination by the union with which it is bargaining.

One of the first decisions upholding the statutory requirement of collective bargaining was the decision of this court in Virginian Ry. Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, 646, affirmed 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. In upholding a mandatory injunction requiring the parties to bargain collective-ly under the terms of the Railway Labor Act, we said:

"We think it clear that the act of 1934 did more than express a pious hope on the part of Congress that the carriers would deal with the representatives which their employees might choose. In providing that 'the carrier shall treat with the representatives so certified [by the Mediation Board] as the representative of the craft or class for the purposes of this Act [chapter]' (45 U.S.C.A. § 152 (ninth), it created a legal right on the part of the employees to have the carrier recognize and treat with their chosen representatives for the purpose of collective bargaining and a corresponding duty on the part of the carrier to recognize and treat with such representatives, so that the purposes of the act might not be nullified by the carrier's refusing to recognize a representative selected by its employees and certified as such by the Mediation Board. And it is no objection to this view that the parties are not bound to agree even though they may treat. The representatives of the employees, as above pointed out, have important functions to perform under the act, which they can perform only if the railroad recognizes and treats with them as representing the employees; and while negotiation may not result in agreement, this is no reason why the carrier should arbitrarily refuse to negotiate with those whom its employees have chosen to represent them in negotiations. In collective bargaining, it may be that negotiation will not result in agreement, but it is certain that there will be no agreement without negotiation."

And we upheld the validity of the requirement, which was attacked under the Fifth Amendment, on the ground that what was required was negotiation, not agreement. With respect to this, we said:

"The act does not require of the carrier the making of any agreement. It does not interfere with the normal exercise of the right of the carrier to select its employees or to discharge them. The requirement that the carrier recognize and treat with the chosen representatives of the employees is but an attempt to 'facilitate the amicable settlements of disputes which threaten the service of the necessary agencies of interstate transportation,' as approved by the Supreme Court in the Railway & S. S. Clerks Case, [Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034].

"It is argued that, as the carrier may refuse to contract with the representatives of the employees, it may refuse to treat with them with a view of contracting, and that, at all events, a requirement to treat is but a vain thing if treaty does not result in contract. As pointed out above, however, the representatives of the employees have many duties to perform under the act looking to the settlement of disputes and the avoidance of industrial conflict, other than the making of contracts; and it is important that their status be determined to the end that these duties may be properly performed, and that the carrier co-operate with them in performing such duties. We cannot see anything arbitrary or unreasonable in requiring that the carrier recognize the representatives of its employees and treat with them as such; and we do not understand on what theory the carrier can be said to be deprived of liberty or property by such requirement. It is but a reasonable regulation in aid of collective bargaining, which, as said by the Supreme Court, in the Railway & S. S. Clerks Case, Congress has chosen to promote as an instrument of industrial peace."

That the National Labor Relations Act, 29 U.S.C.A. § 141 et seq., did not require agreement but merely good faith bargaining was elaborated by this court with a discussion of what was meant by good faith bargaining in the latter decision of N. L. R. B. v. Highland Park Mfg. Co., 4 Cir., 110 F.2d 632, 637, where we quoted with approval an opinion of Judge Sibley in the Fifth Circuit dealing with the matter. We said:

"The requirement to bargain collectively is not satisfied by mere discussion of grievances with employees' representatives. It contemplates the making of agreements between employer and employee which will serve as a working basis for the carrying on of the relationship. The act, it is true, does not require that the parties agree; but it does require that they negotiate in good faith with the view of reaching an agreement if possible; and mere discussion with the representatives of employees, with a fixed resolve on the part of the employer not to enter into any agreement with them, even as to matters as to which there is no disagreement, does not satisfy its provisions. 'The Act contemplates the making of contracts with labor organizations. That is the manifest objective in providing for collective bargaining'. Consolidated Edison Co. [of New York] v. National Labor Relations Board, 305 U.S. 197, 236, 59 S.Ct. 206, 220, 83 L.Ed. 126. 'The legislative history of the Act goes far to indicate that the purpose of the statute was to compel employers to bargain collectively with their employes to the end that employment contracts binding on both parties should be made'. National Labor Relations Board v. Sands Mfg. Co., 306 U.S. 332, 342, 59 S.Ct. 508, 513, 83 L.Ed. 682.

"The duty imposed by the statute was well expressed by Judge Sibley, speaking for the Circuit Court of Appeals of the 5th Circuit in Globe Cotton Mills v. National Labor Relations Board, 5 Cir., 103 F.2d 91, 94, as follows: 'We believe there is a

duty on both sides, though difficult of legal enforcement, to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement touching wages and hours and conditions of labor, and if found to embody it in a contract as specific as possible, which shall stand as a mutual guaranty of conduct, and as a guide for the adjustment of grievances.' "

What was implicit in these opinions was expressly set forth in the Labor Management Relations Act of 1947, § 8 (d) 29 U.S.C.A. § 158(d) of which provides:

"(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *."

█ The statute requires good faith bargaining with respect to wages and other matters affecting the terms and conditions of employment, not with respect to matters which lie within the province of management, such as the financial condition of the company, its manufacturing costs or the payment of dividends. And we do not think that merely because the company has objected to a proposed wage rate on the ground that it cannot afford to pay it, good faith bargaining requires it to open up its books to the union in an effort to sustain the ground that it has taken. If such were held to be the law, demand for examination of books could be used as a club to force employers to agree to an unjustified wage rate rather than disclose their financial condition with such

confidential matters as manufacturing costs, which could conceivably be used to their great damage. To bargain in good faith does not mean that the bargainor must substantiate by proof statements made by him in the course of the bargaining. It means merely that he bargain with a sincere desire to reach an agreement. There can be no question but that the company here was bargaining in that spirit.

It is to be noted that the statute expressly provides that neither party is under obligation to make any "concession" in connection with the bargaining; but, if the position of the Board here is sustained, it will result that every employer who resists a wage increase on economic grounds must make the concession of opening up his books and disclosing to the union not only his general financial condition, but such highly confidential matters as manufacturing costs. We feel sure that it was never intended that the employer be required to disclose such information to its employees as an incident of collective bargaining; and we feel equally sure that Congress never would have passed a statute which it thought could have been given such interpretation. It might be appropriate to require the furnishing of such information to a labor court with power to fix wages, but not to those who are bargaining at arm's length and who would be under no obligation to act upon the information if received.

There is nothing in our decision in N. L. R. B. v. Whitin Machine Works, 4 Cir., 217 F.2d 593 which supports the order of the Board. That case had to do with furnishing information as to wages paid the employees, information which the company here offered to furnish, not with dividends, manufacturing costs or the general financial condition of the employer. The information there required to be furnished related to matters with which bargaining was properly concerned. The information here asked relates to matters altogether in the province of management, which were not the proper subject of bargaining. The de-

cision of the Court of Appeals of the 2nd Circuit in N. L. R. B. v. Yawman & Erbe Mfg. Co., 2 Cir., 187 F.2d 947 is distinguishable on the same ground.

The Board relies particularly on the decision of the 2nd Circuit in N. L. R. B. v. Jacobs Mfg. Co., 2 Cir., 196 F.2d 680, 684. In that case, however, it appears that the employer had refused to meet and negotiate with the union, after an initial meeting at which it had stated that it could not afford a wage raise and did not consider certain other matters subject to change under the collective bargaining agreement then in effect. The unfair labor practice there consisted in the refusal to bargain at all, and the order of the Board was entered to redress that practice. It is to be noted that, even as an order redressing what was unquestionably an unfair practice in refusing to bargain, it did not go so far as the demand made by the union here. The opinion in that case states that "the Board's order does not require the respondent to produce any specific business books and records but information to 'substantiate' its position in 'bargaining with the Union.'" The opinion seems to say that, in the absence of refusal to bargain such as was there involved, there is no obligation on the part of the employer to substantiate by its record the position it has taken, for it contains the categorical statement: "To bargain collectively in compliance with the statute does not mean that an employer must produce proof to establish that he is right in his business decision as to what he can, or cannot, afford to do." If other language in the opinion seems to support the position here taken by the Board, we cannot accept it as a correct statement of the law.

Our conclusion is that failure to comply with the demand to furnish to the bargaining union the information here demanded did not establish bad faith in the bargaining, in which the employer here was admittedly engaged, and that there was no basis for the Board's finding of an unfair labor prac-

tice. The petition for enforcement must accordingly be denied and the order of the Board set aside.

Enforcement denied and order set aside.