**CARLSON ROOFING CO., INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–2143.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1980.

Decided Aug. 6, 1980.

Peter DeBruyne, Rockford, Ill., for petitioner.

Robert Sewell, N.L.R.B., Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and JAMESON, Senior District Judge.[*]

JAMESON, Senior District Judge.

Carlson Roofing Co., Inc. (the Company) has petitioned for review of an order of the National Labor Relations Board finding that the Company (1) violated Section 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (3), by suspending its employees for the day of April 12, 1978, in response to their concerted protest of working conditions and their support of the Union position regarding the size of repair crews, and (2) violated Section 8(a)(1) by threatening to lay off its employees until June 1 for the same activities. The Board filed a cross-application seeking enforcement of its order.[1] We grant enforcement of the Board's order based on violation of § 8(a)(1).

### Factual Background

The Company, a roofing concern located at Rockford, Illinois, employs approximately 50 roofers. It is engaged primarily in the installation of new roofs, with about five per cent of its business devoted to roof repair. The Company has recognized the Union[2] as the bargaining representative of its employees for approximately 40 years.

Since 1970 the Company has bargained with the Union on a multi-employer basis. A series of collective bargaining contracts between 1970 and 1978 contained the following provision:

Patch and repair crews shall consist of one or more journeymen roofers along with helpers as required for safe working conditions and accepted roofing practice.

If working conditions at the job site proves need for additional help, the foreman shall call the employer for additional help or instructions.

Prior to 1977, it was the general practice of the Company to assign only one employee to perform repair work. In July, 1977, Philip Schultz became business agent of the Union and began pressing for two-man repair crews because of the risks involved when one man was required to haul material up ladders.[3] Following a meeting on September 6, 1977, between the Union and representatives of the Company and other roofing firms, Carlson "decided to give [two-man crews] a try on a trial basis to see how it works out".[4]

Two-man crews were used on most repair jobs for the ensuing seven months, although the Company occasionally assigned four of the employees to perform repair work alone. Those employees sometimes complained about the one-man assignments, but there was evidence to support the Board's finding that no employee had "refused" to work alone.

On April 11, 1978, George Gentzel was assigned by the Company to do a small repair job on the roof of a building in Oconomowoc, Wisconsin. Gentzel asked for help, expressing his reluctance to go on the repair job alone; but the Company had estimated that a single man could do the job in an hour, and Gentzel was told to go alone. The Company claims Gentzel said he could not afford to be fined by the Union. Although Gentzel was told not to worry about the fine, he called business agent Schultz, who contacted a sister local in the Milwaukee area for an extra man. When this was reported to the Company, the job was postponed.

---

* The Honorable William J. Jameson, Senior District Judge of the United States District Court for the District of Montana, is sitting by designation.

1. The order was dated September 19, 1979 and is reported at 245 NLRB No. 4.

2. Roofers Local No. 6, United Slate, Tile, and Composition Roofers, Damp and Water Proof Workers Association, AFL–CIO.

3. Schultz also cited the case of an employee who suffered a heart attack on a roof while working alone.

4. Edwin Carlson, president of the Company, had stated at the meeting that precedent reaching back to 1940 permitted contractors to send only one employee to do repair work and urged that any change should await negotiations for a new contract to replace the current contract which would expire on May 31, 1978.

On the morning of April 12, 1978, Ed Carlson told Nick Di Angelo, an employee of 38 years and member of the union executive board, that he had decided the two-man crews were too expensive. Carlson also advised Schultz that the two-man crews were too expensive and that the Company had precedent for sending out only one man. Schultz replied that the size of the repair crews was to be a subject of negotiation on the new contract. Carlson asked what would happen if he sent a man home for refusing to work by himself, and Schultz replied that the man would have the right to file a grievance. When Carlson asked what would happen if he sent them all home, Schultz replied that was up to Carlson. The Board found that after the phone call to Schultz, Carlson kicked a pail and said, "We ain't going out until we get this damn thing straightened out. I don't care if it takes until June the 1st."

Carlson then convened a meeting in the "warm room" of the 30 to 35 roofers who were waiting for their job assignments.[5] Carlson recalls starting the meeting by reading the repair article from the contract, telling the men that there was precedent for one man doing repair work, and that although the Company had tried the two-man crews, they were too expensive and complaints were already being received from the customers who would ultimately call some other company to do the work. He said it was not fair for the Union to now insist on two-man crews. Three of the employees who had performed one-man assignments expressed reluctance to go out alone.[6] Carlson ended the meeting by telling the men no one was going out to work that day until the repair issue was settled. Carlson also asked whether the principle of two-man crews was important enough for the employees to stay out until June 1, when the contract would be renegotiated, although he claims that remark was made

to Di Angelo alone as they were leaving the warm room after the meeting had ended.

Pursuant to the Company's directions, none of the employees worked on April 12, and they were not paid for that day. On the advice of Carlson's legal counsel, all of the men were allowed to return to work the following day. Negotiations for the new collective-bargaining agreement began on April 17, 1978.

### Administrative Proceedings

On May 4, 1978, an unfair labor practice complaint was filed with the N.L.R.B., charging that the Company had violated § 8(a)(1) and § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and § 158(a)(3), by threatening employees with layoffs and by actually laying off employees on April 12, 1978.

On April 17, 1979, the Board, through an administrative law judge (ALJ), conducted a hearing. On July 11, 1979, the ALJ rendered his decision, finding that the Company had violated the Act as charged. On September 19, 1979, the Board adopted, with minor modifications, the recommended order of the ALJ, affirming his rulings, findings and conclusions. The Company was ordered to cease and desist from the violations found, and ordered not to interfere with the employees' § 7 rights. The Company was also ordered to make whole its employees for their losses due to the April 12, 1978, suspension, to make records available for determining back pay, and to post an appropriate notice.

The Company filed this petition pursuant to 29 U.S.C. § 160(f) to review the order of the Board, and the Board filed a cross-application for enforcement of its order.

### Protected Activities under § 8(a)(1)

■ Section 7 of the Act, 29 U.S.C. § 157, provides in part that, "Employees shall

---

5. The remaining employees were away on jobs to which they had been assigned earlier.

6. Gentzel said that he did not want to work alone, but that he did not refuse to do so. Another employee stated that he was not going out alone as long as he understood the contract to provide that an employee should not work by himself. The third stated he did not want to cause any problems, and that if the Union did not want one-man crews, he was not going to go out alone.

have the right . . . to engage in . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by § 7.

The Company argues that the employees, either individually or through their Union, did not engage in "protected" activity within the meaning of the Act since they refused to work singly on repair jobs despite a clear contract term allowing it and despite a consistent past practice of sending out only one man. The Company relies on N. L. R. B. v. Sands Manufacturing Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939), which held that the repudiation of a contract term in a collective bargaining agreement is not protected by the Act.

The Board, however, found Sands inapposite because in that case it was clear the employees were "irrevocably committed not to work in accordance with their contract" (Id. at 344, 59 S.Ct. at 514), while in this case the contract was "clearly susceptible to a construction that at least two employees should be assigned to any job at which it can reasonably be contended that safety would be imperilled by anything less."

Sands was distinguished further because Carlson had "acquiesced" in assigning two-man crews for repair work since September of 1977. The Board concluded also that even if the Union improperly interpreted the contract, it had not made an unequivocal declaration of its intent to enforce that construction. There is no evidence in the record that any employee was ever fined for working alone.[7] Although several employees expressed a desire not to work alone, the Board found that none had flatly refused to do so.[8] The Board found further that "these tentative and untested employee sentiments" did not constitute a "partial strike," which is not protected activity, as argued by the Company. Cf. Shelly & Anderson Furniture Manufacturing Co. v. N. L. R. B., 497 F.2d 1200, 1203 (9 Cir. 1974); C. G. Conn, Ltd. v. N. L. R. B., 108 F.2d 390, 397 (7 Cir. 1939).

The Board ruled that the employees' acts were protected because the employees were engaged in concerted activity covered by § 8(a)(1) of the Act when they voiced opposition to the one-man policy of the Company in an orderly fashion. Carlson's threats of layoffs on April 12, 1978, and the actual laying off of employees on that date as a result of their concerted protected activities, were found to be violations of § 8(a)(1) of the Act.[9]

7. The Board found the evidence hazy regarding the issue of the imposition of union fines on members who performed repair work themselves, but determined it was clear the Union never formally announced such a rule.

8. The decision of the ALJ says in part: "Instead of simply telling Schultz to cancel the arrangement with the Milwaukee local and then ordering Gentzel to, once more, do the job by himself, Carlson lost his temper and put Gentzel on the spot in front of the other employees; when Gentzel repeated that he did not want to work alone, and one or two others similarly expressed themselves in answer to a hypothetical question, Carlson's anger exploded and a mass suspension ensued, mostly affecting employees who were in no way involved in the dispute."

9. Cone Mills Corp. v. N. L. R. B., 413 F.2d 445 (4 Cir.), cited by Carlson Roofing, is not in point. In that case the court held an employer was justified in discharging employees who refused to go back to work after being told to do

so, especially since a grievance procedure was available. In the present case, however, no employees refused outright to work, nor were any ordered to work against their stated desires. Resort to the grievance procedure would have been premature. As this court stated in Dreis & Krump Manufacturing Co. v. N. L. R. B., 544 F.2d 320, 326 (7 Cir. 1976), with regard to § 7 rights and grievance procedures:

We do not disaffirm the existence of a national policy which favors resort to grievance procedures to settle labor disputes. However, an employee, on the basis of existing authority, can be charged with contravention of an established grievance procedure only where he deliberately spurns Union auspices and instead attempts to directly initiate negotiations with his employer regarding working conditions.

Here Carlson initiated the discussions with the employees who did not strike or walk out, but were merely acting together under § 7 to say what they thought the contract meant.

We conclude that the findings of the Board on this issue are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(f); see *N. L. R. B. v. Ben Pekin Corp.*, 452 F.2d 205, 207 (7 Cir. 1971).

*Antiunion Motivation under § 8(a)(3)*

■ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), reads in pertinent part:

(a) It shall be an unfair labor practice for an employer—

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization . . . .

The Company contends that the Board erred in finding that its one-day lockout for a legitimate business purpose was a violation of § 8(a)(3) in the absence of proof of antiunion animus on the part of the Company. The Company relies upon *American Ship Building Co. v. N. L. R. B.*, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), and the companion case of *N. L. R. B. v. Brown*, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). *American Ship Building* generally upholds lockouts where there is no specific evidence of antiunion animus. The Court held that the employer does not violate "§ 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." 380 U.S. at 318, 85 S.Ct. at 967. In *Brown* the Court held that where . . . the tendency to discourage union membership is comparatively

slight, and the employers' conduct is reasonably adapted to achieve legitimate business ends or to deal with business exigencies, we enter into an area where the improper motivation of the employers must be established by independent evidence.

380 U.S. at 287–88, 85 S.Ct. at 286.

The Board in this case, however, relied on the balancing approach to the legality of lockouts found in *N. L. R. B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967).[10] In determining a violation of § 8(a)(3) under *Great Dane*, if the employer's conduct is "inherently destructive" of important employee rights, no proof of an antiunion motivation is needed. If, however, "the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight', an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.* at 34, 87 S.Ct. at 1798.

The Board, in applying *Great Dane*, found the Company's actions had at least a "comparatively slight" adverse effect on the rights of the employees. The Company then came forward with evidence of business justifications for its conduct. The business justifications were found by the Board to have fallen "far short of the marks", however, so that the issue of antiunion animus did not have to be reached.[11] The Board found that while it was a legitimate bargaining objective to want to get the issue of the size of the repair crew "straightened out," failure to reach that objective "cannot constitute a 'legitimate

10. In *Lane v. N. L. R. B.*, 418 F.2d 1208, 1209–12 (D.C.Cir. 1969), the Supreme Court's approach to § 8(a)(1) and § 8(a)(3) of the Act was described as being in a "state of flux". The D. C. Circuit did conclude, however, that "the result in *American Ship* [is] compatible with the tests enunciated in *Great Dane*" and "the principles enunciated by Chief Justice Warren in *Great Dane* are the present law governing Sections 8(a)(1) and 8(a)(3)." *Id.* at 1212.

11. The ALJ seemed less than certain about the Company's antiunion animus. While noting

the Company's "lengthy and positive" relationship with the union, he found Carlson's

flash of anger, resulting in reprisal against the employees because of the conduct of their agent might arguably be classified as the sort of union animus which renders a lockout unlawful.

However, being less than certain about this argument, I shall address the combinations of elements set out in *Great Dane Trailers, supra*, which render unnecessary an inquiry into actual motive.

and substantial business justification' for suspending the employees". The Board found Carlson had acted out of "sheer pique".

The Company has argued consistently, however, that its business justification was that the one-man repair crew was vital to the long-term health of the Company. Although repair work comprises only five per cent of its business, Carlson testified that two-man repair crews resulted in complaints from customers. He further testified that sometime down the road those customers would need new roofs, and it was that business he did not want to lose. The Company contends that it did not violate § 8(a)(3) of the Act merely because it engaged in a lawful, one-day lockout of its employees for this legitimate business purpose. The Company contends further that it was prevented from submitting all of its evidence on this issue.

In *N. L. R. B. v. Wire Products Manufacturing Corp.*, 484 F.2d 760 (7 Cir. 1973), this court considered the standard of review where a § 8(a)(3) violation is alleged, saying in part:

Statements and conduct which could be the basis for inferring animus, which the parties each entertain toward the other, are not difficult to detect. The standard here, however, is not the existence of an inchoate animus but rather whether that feeling did in fact motivate. In the legislative scheme, the courts serve some more worthwhile purpose than that of automatically rubberstamping approval of Board determinations. In the consideration of this particular issue, "[a]n unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one." *N. L. R. B. v. McGahey*, 233 F.2d 406, 413 (5 Cir. 1956).

484 F.2d at 765.

We cannot find that the record here taken as a whole presents "a substantial basis of believable evidence pointing toward [an] unlawful [motive]". No inquiry was undertaken to determine whether the Company's motivation was antiunion. The Company agreed in September of 1977 to use two-man repair crews on a "trial basis". They had been tried, but complaints had been received. When the Company tried to revert back to the one-man crew where feasible, opposition was encountered. Bargaining for a new contract was to begin soon and the Company wanted to return to one-man repair crews and avoid the precedent of two-man crews at the negotiating session. We find that the Company's desire to return to the original one-man repair crew, in view of the complaints it had received, and before formal negotiations on the new contract commenced, was a legitimate and substantial business justification for the lockout. It then became incumbent on the Board to present evidence of antiunion motivation.

As we said in *N. L. R. B. v. Wire Products Manufacturing Co., supra,*

*American Ship Building* and *Brown*, when read together, reflect that lockouts are not per se violations of the National Labor Relations Act. "[T]he Board must find from evidence independent of the mere conduct involved that the conduct was *primarily* motivated by an antiunion animus." (Emphasis added.) *Brown*, 380 U.S. at 288 [85 S.Ct. at 986]. Nothing in *N. L. R. B. v. Great Dane Trailers, Inc.*, 388 U.S. 26 [87 S.Ct. 1792, 18 L.Ed.2d 1027] (1967), leads to a contrary conclusion because there the Court concluded that the employer's conduct was "inherently destructive" of important employee rights, thus relieving the Board of proving antiunion motivation. Further, the Company there offered no evidence of legitimate motives.

484 F.2d at 764.

Ordinarily, this case would be remanded for an evidentiary hearing to allow the Board to present any evidence of the Company's antiunion animus. Since we grant enforcement of the Board's order for the § 8(a)(1) violation, however, that would have no practical effect. We find the Company violated § 8(a)(1) by interfering with

the employees' § 7 rights; but a violation of § 8(a)(3) does not necessarily follow,[12] and we do not find substantial evidence to support a finding of a violation of § 8(a)(3). Enforcement of the Board's order, including back pay, for the violation of § 8(a)(1), is granted.

Enforcement Granted In Part And Denied In Part.

---

12.   See, *e. g., N. L. R. B. v. Wire Products
Manufacturing Corp., supra.*