43 N.J. Super. 172 (1956)
128 A.2d 20
BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND JOHN J. PLUNKETT, RESPONDENTS. BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND THOMAS R. HECK, RESPONDENTS. BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND ALBERT S. VAN SCIVER, RESPONDENTS. BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND CLARENCE P. COMEGYS, RESPONDENTS. BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND PETER G. LEFFLER, RESPONDENTS. BEAUNIT MILLS, INC., APPELLANT,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR & INDUSTRY, STATE OF NEW JERSEY, AND FRANK SMITH, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 19, 1956.
Decided December 28, 1956.
*174 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. S. David Harrison argued the cause for Beaunit Mills, Inc., Appellant on all appeals (Messrs. Platoff, Platoff & Heftler, attorneys; Mr. George Heftler, of counsel).
Mr. Clarence F. McGovern argued the cause for respondent Board of Review, Division of Employment Security.
The opinion of the court was delivered by FRANCIS, J.A.D.
The question to be determined on this appeal is whether the employees involved are barred from unemployment compensation on the ground that they had been "discharged for misconduct connected with [their] work." N.J.S.A. 43:21-5(b).
The cited section of the Unemployment Compensation Law provides as follows:
"An individual shall be disqualified for benefits:

* * * * * * * *
(b) For the week in which he has been discharged for misconduct connected with his work, and for the five weeks which immediately follow such week (in addition to the waiting period), as determined in each case."
*175 The matter was before us on an earlier occasion. However, the facts had not been fully developed and we remanded for completion of the record. 38 N.J. Super. 547 (App. Div. 1956).
Guilt of the type of misconduct condemned by the statute is a conclusion which can be reached only through the avenue of the facts of the particular case. Consequently it is necessary to detail them here.
Prior to the events with which we are concerned, Beaunit Mills, Inc. and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 676, American Federation of Labor, had executed a collective bargaining contract covering employees of the Beaunit Trucking Division at Delran, New Jersey. Article VIII thereof lists insubordination as a cause for dismissal and provides:
"* * *
When an employee is dismissed for reasons other than the lack of business, he may upon request, have a hearing before the committee composed of representatives of the Employer and the Union. If Representatives of the Employer and the Union are unable to agree, an outside neutral Arbitrator selected by the Employer and the Union may be called in to settle the difference. In case the Employer and the Union are unable to agree upon an Arbitrator then the Director of Federal Mediation and Conciliation Service shall be requested to designate and [sic] arbitrator. Such arbitration decision shall be final and binding on both the Employer and the Union and the Employee. * * * All such cases of discipline or discharge shall be taken up within ten (10) working days from the date of such discipline or discharge or the employee * * * waives his * * * rights therein. * * *." (Emphasis added)
Article IX deals with the appointment of a shop steward whose "sole function * * * shall be to see that the terms of this Agreement are fulfilled both by the Employer and the Employees."
Arbitration generally is treated under Article XIII as follows:
"Differences arising out of the interpretation and application of the terms of this agreement that have not been resolved between the Employer and the Union may, at the option of either party, be submitted to arbitration. * * *."
*176 One Posch, a truck driver, became the shop steward. On January 22, 1955, after at least three and a half years service, he was discharged; whether it was effective that same day or at a later time is not clear. So far as the men involved in these proceedings are concerned, it was a sudden and unceremonious discharge. To their knowledge, no reason was assigned by the company and they were not aware of the basis for the action. And Posch told some of the men that he did not know why he had been fired. It seems fairly obvious that his statement was untruthful, but it is even more obvious that the men believed him. Since he was their shop steward, they apparently were leaderless without him.
In any event, on January 26 a few of the men discussed engaging in a work stoppage for a day to protest Posch's discharge. As the early morning shift of truck drivers began to arrive on Thursday, January 27, talk began about refraining from work until they found out why Posch had been fired summarily. Posch was among these men but whether he was to drive that day does not appear. As the result, 17 drivers and platform workers decided to engage in what was variously described as a "work stoppage," a "strike" or a "walkout," in order to find out the reason for the discharge. None of them at any time intended to quit their jobs. One driver in his testimony seemed to express the common feeling, namely: "I was willing to go to work right then if they told us why he was laid off." Another expressed his bewilderment by saying that "if they could do that to anybody" he was wondering "if they could do it" to him. Still another testified that the drivers were "a pretty good gang"; "one of the fellows got a raw deal," and "everybody in general" said there was a strike. No union official (outside of Posch) was present and the union had not ordered the strike.
The employer's truck dispatcher appeared on the scene. He urged the necessity of getting the trucks rolling and said "We will settle it later." No one spoke or answered for the men. The record does not reveal whether they *177 advised him of the reason for their strike or that it was mentioned at all by anyone.
The dispatcher telephoned William A. Dodge, the executive vice-president of Local No. 676, and explained the situation to him. Dodge told him to instruct the men to go to work. However, there is nothing to indicate that he informed the men of this conversation. Then, following telephone orders from the Supervisor of the Trucking Division, he announced that if they did not begin their operations within a half hour, they would be discharged. At no time did he make any statement regarding the dismissal of Posch, although it must be that he knew the source of the difficulty. One of the drivers asserted at the Board of Review hearing that if the reason had been given, even if he thought it was an unfair one, he would have resumed work. The men did not yield, and at the end of the period their time cards were removed from the rack as the signal of their discharge.
Later in the morning the union executive Dodge appeared on the scene. Some of the men ("a couple") were still there. Dodge told them why Posch had been let go by the company and informed them also that as far as the union was concerned, the strike was unauthorized. Still later, an unnamed number of the strikers reported for work and were permitted to do so by management; others who undertook to return later in the afternoon were rejected.
About 3 P.M. Dodge tried to arrange a meeting to discuss the matter but the Supervisor of the Trucking Division refused. Then he sent a formal written request for a conference and was informed of the company's willingness to meet but not to discuss the Posch discharge. At Dodge's order, the strikers appeared for work on Friday and Saturday mornings, the reason being that he thought management would relent and take them back. As he put it, the union was willing "to sit down and arbitrate Posch's case" and he "didn't see why the men should be involved." However, on both days, the men were ordered off the company's premises; according to one of the repentant strikers they were told they were trespassers and would be arrested if they did not *178 leave. Another of the strikers telephoned the employer's dispatcher around 7 P.M. on January 27 and inquired as to what was going on. The dispatcher said to him: "I have nothing to say. * * * You just quit this morning."
Some months thereafter, all of the men who wished to return, except two, Posch being one of them, were reinstated and their full seniority rights restored. This was done voluntarily by the company after conferences with the union. By way of explanation, the Supervisor said the men were "victims of circumstances" and they had ability and character and were "worthwhile considering as continued employees inasmuch as they, in the main part, were long time employees of the company." He thought also "from hearsay" that they were possibly "coerced" into the situation. On the other hand, Posch's case went to arbitration and the dismissal was sustained.
Upon the introduction of the circumstances outlined, the Board of Review held that section 5(b) of the law did not bar recovery of unemployment compensation.
The employer contends now, as it did before the Board, that the employees having been discharged properly for misconduct connected with their work, are disqualified. More specifically, the misconduct charged is engaging in a strike or work stoppage which constituted a breach of the collective bargaining agreement between the company and the union, which represented all of the employees involved. Bogue Electric Co. v. Board of Review, etc., 21 N.J. 431 (1956), is cited in support of the contention. There, too, an employee, who was the shop steward, was discharged and a number of his fellow workers walked off their jobs in protest. As here, all of them were discharged. The pertinent contract with the union stipulated that "[u]nder no circumstances shall there be any strike * * * cessation of work * * * or interruption of the normal conduct of the Company's business during the term of this agreement." And it provided also that the union "shall forthwith suspend from membership and the Company shall immediately discharge any Employees engaged in * * * any strike * * * *179 or cessation of work * * * or wildcat strike * * *." 21 N.J., at page 434.
The Supreme Court declared that the striking employees were guilty of misconduct in the statutory sense and not entitled to unemployment benefits. Among other things, the opinion says:
"* * * It would seem to be altogether at variance with the policy of the statute to permit a group of employees to deliberately violate a basic provision of a collective bargaining agreement which the parties to the agreement consider of such importance that, for a violation thereof, the union is required to suspend such an employee from membership and the employer in turn to discharge him immediately. It would be in plain derogation of the spirit and policy of the act  protection against the hazard of involuntary unemployment  to provide unemployment benefits to employees who were lawfully discharged for a deliberate breach of a contract to which they were parties." 21 N.J., at page 436.
The courts of Pennsylvania and Michigan have given the same effect to the misconduct disqualification under their unemployment compensation laws. Cassar v. Appeal Board of Michigan Employment Sec. Commission, 343 Mich. 380, 72 N.W.2d 254 (Sup. Ct. 1955); H.J. Heinz Co. v. Unemployment Compensation Board of Review, 172 Pa. Super. 324, 94 A.2d 82 (Super Ct. 1953); Yellow Cab Co. of Philadelphia v. Unemployment Compensation Board of Review, 170 Pa. Super. 625, 90 A.2d 599 (Super. Ct. 1952). See contra: Milne Chair Co. v. Hake, 190 Tenn. 395, 230 S.W.2d 393 (Sup. Ct. 1950). In fact, in industrial relations generally the settled rule seems to be that a strike in violation of a "no strike clause" in a contract is an illegal one; one that is not deemed a protected activity under the Labor Management Relations Act, 29 U.S.C.A., § 157 et seq. Consequently, in such cases an employer is justified in imposing the sanction of discharge upon employees who engage in the breach. N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939); N.L.R.B. v. Furriers Joint Council, etc., 224 F.2d 78 (2 Cir. 1955); N.L.R.B. v. National Die Casting Co., 207 F.2d 344 (7 Cir. 1953); United Biscuit Co. of America v. N.L.R.B., 128 F.2d 771 (7 Cir. 1942); *180 Hazel-Atlas Glass Co. v. N.L.R.B., 127 F.2d 109, 117 (4 Cir. 1942); In re W.L. Mead, Inc., 113 N.L.R.B. 1040 (1955); In re Kraft Foods Co., 108 N.L.R.B. 1164 (1954); In re Cities Service Refining Corp. & Office Employees International Union, Local 87, A.F.L., 105 N.L.R.B. 797 (1953); In re National Electric Products Corp., 80 N.L.R.B. 995, 999 (1948); In re Joseph Dyson & Sons, Inc., 72 N.L.R.B. 445 (1947); Annotation 2 A.L.R.2d 1278, 1288 (1948), Supplement Service, p. 99; In re Scullin Steel Co., 65 N.L.R.B. 1294, 1317-1318 (1946). Moreover, it has been held that even in the absence of such a prohibitory clause, if mandatory grievance machinery is prescribed for the settlement of disputes arising under the bargaining agreement, a strike before resorting to such procedure warrants discharge. United Construction Workers v. Haislip Baking Co., 223 F.2d 872 (4 Cir. 1955), certiorari denied 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754 (1955).
In the present case the agreement does not contain a no-strike stipulation; nor is the grievance procedure imperative. A discharged employee "may" upon request utilize it; and a difference arising out of the interpretation or application of the contract "may, at the option of either party be submitted to arbitration." But the company argues that the inclusion of grievance and arbitration provisions impliedly signifies that disputes arising from discharges shall be disposed of by such means exclusively without resort to strike. And from this premise the argument proceeds to the final claim that the strike of these employees being violative of the implied no-strike compact makes the Bogue doctrine applicable and requires a denial of unemployment compensation.
Everyone concedes that equality of bargaining between employer and employees finds its ultimate in the written agreement establishing wages, hours and conditions of employment. That plane of equality was reached only through years of travail and economic loss. But achievement brings responsibility; it carries with it acceptance of the fact that *181 the purpose of the bargaining contract is to provide a statement of principles and rules for the orderly government of the employer-employee relationship in the future; it adds dignity to the position of labor and destroys for all time the feeling that the workman is a mere pawn in the economic life of the country and subject to the arbitrary power of the employer. And it is of incalculable value in the elimination of the causes of industrial strife. N.L.R.B. v. Highland Park Mfg. Co., 110 F.2d 632 (4 Cir. 1940); N.L.R.B. v. Columbian E. & S. Co., 96 F.2d 948, 953 (7 Cir. 1938), affirmed 306 U.S. 292, 59 S.Ct. 501, 83 L.Ed. 660 (1939).
These basic concepts as well as such legislative restrictions on the right to strike as that appearing in 29 U.S.C.A., § 158(d) (4) lend persuasive force to the company's argument that courts, in examining labor contracts, should resolve doubts in favor of an intention to waive the right to strike. See Annotation 2 A.L.R.2d 1278, 1281 (1948). On the other hand, the right to strike, even though not absolute, is a fundamental one in labor relations. When Congress enacted the Federal Labor Management Relations Act, 29 U.S.C.A., § 157 et seq., the right (even though qualified in some respects, note section 158(d) (4), supra) was preserved and waiver thereof was designedly left as a matter for bargaining between the parties. N.L.R.B. v. Mastro Plastics Corp., 214 F.2d 462 (2 Cir. 1954), affirmed 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. ___ (1956); Local No. 3, etc. v. N.L.R.B., 210 F.2d 325, 331-333 (8 Cir. 1954), certiorari denied Local No. 3, etc., v. Wilson & Co., 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648 (1954); Cox, "The Labor Management Relations Act," 61 Harv. L. Rev. 274, 309 (1948). The same philosophy is manifested by our own legislative enactments, N.J.S. 2A:15-51 et seq. Thus it may be said with considerable vigor that relinquishment of the strike as an instrument of pressure should not be found by implication unless clearly apparent from the words of the contracting parties. And see, N.L.R.B. v. Lion Oil Co., 77 S.Ct. 330.
*182 The employer cites Weimer v. Unemployment Compensation Board of Review, 176 Pa. Super. 348, 107 A.2d 607 (Super. Ct. 1954), as supporting its position of implied waiver. The contract in that case did not contain a no-strike clause but did create grievance procedure. Employees who struck in protest of the discharge of one of their number without first presenting a grievance and who were then discharged themselves were held disqualified for unemployment compensation under the misconduct section of the Pennsylvania Act. However, the opinion does not indicate whether or not the grievance clause was mandatory.
In our judgment, it is not necessary in this instance to decide the issue of implied waiver of the right to strike under the contract before us. The just result is apparent even assuming that the employer acted lawfully in discharging the men. Breach of a collective bargaining agreement by an employee does not per se constitute such "misconduct" as will wipe out the right of a discharged employee to unemployment benefits. For this to result, the cause of the discharge (the nature of the breach of contract) must be such as to constitute "misconduct" in the statutory sense. The Bogue case seems to accept this view. 21 N.J., at page 435.
What does the statutory misconduct signify? Obviously it cannot mean "mere mistakes, errors in judgment or in the exercise of discretion, or minor but casual or unintentional carelessness or negligence, and similar minor peccadilloes." It cannot mean mere inefficiency, unsatisfactory conduct, failure of performance as the result of inability or incapacity, inadvertence in isolated instances, or good faith errors of judgment. Boynton Cab Co. v. Neubeck, 237 Wis. 249, 296 N.W. 636 (1941); Kempfer, "Disqualifications for Voluntary Leaving & Misconduct," 55 Yale Law J. 147, 162-166 (1945). In our opinion, the statement in 48 Am. Jur., Social Security, Unemployment Compensation, etc., § 38, at 541 (1943), suggests the fair intendment of the statute:
*183 "Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer."
Annotation, 146 A.L.R. 243 (1943); 1 C.C.H., Unemployment Insurance Reporter, § 1970, p. 2315.
We do not believe that the Bogue case conflicts with this general definition. The strongly restrictive language of the express no-strike clause, plainly indicates an intention to create an awareness of the seriousness of the pact from the standpoint of both union and employer. It is apparent also that the provision was designed not only to protect the employer but to protect the union and preserve control and discipline among its members.
The situation here is in sharp contrast. There is neither a no-strike compact nor mandatory grievance procedure. The shop steward was discharged after some years of service, without reason or without a reason having been given, so far as these claimants knew. He was their elected shop steward, presumably the man they looked to for guidance in their dealings with the employer. He told some of them that he did not know why he had been discharged. Even though this seems to have been untruthful, no one informed them of the true fact until after the strike and their discharge. And the shop steward in furtherance of his own interest was encouraging their dissatisfaction. It is not unnatural that his fellow workers would be concerned as to whether one of them could be fired without a word or a reason after years of loyal effort. So when they decided, most of them spontaneously, on the morning in question to abstain from work until they found out why their shop steward and fellow truck driver had been discharged, they were engaged in a concerted activity in good faith for their mutual aid and protection. Here the understanding observation *184 of Judge Learned Hand in N.L.R.B. v. Peter C.K. Swiss Choc. Co., 130 F.2d 503, 505 (2 Cir. 1942), although in another context, is worthy of mention:
"When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a `concerted activity' for `mutual aid and protection,' although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is `mutual aid' in the most literal sense, as nobody doubts."
And see N.L.R.B. v. Kennametal, Inc., 182 F.2d 817, 819, 19 A.L.R.2d 562 (3 Cir. 1950); Carter Carburetor Corp. v. N.L.R.B., 140 F.2d 714, 718 (8 Cir. 1944); Firth Carpet Co. v. N.L.R.B., 129 F.2d 633, 635-636 (2 Cir. 1942).
Manifestly, the protest over the abrupt manner of Posch's discharge (as the men understood it) and their work stoppage in ordinary circumstances would constitute a bona fide labor dispute. The fact that the stoppage was unwise or unjustified would not make it unlawful (Cusano v. N.L.R.B., 190 F.2d 898, 902 (3 Cir. 1951); N.L.R.B. v. Globe Wireless, 193 F.2d 748, 750 (9 Cir. 1951)), and justify their discharge unless by implication under their contract the right to strike had been surrendered. Would it be just to say that because truck drivers failed to read an implied waiver into the contract their union made for them, they convicted themselves of misconduct connected with their work?
As the record reveals, these men actually were more concerned with their own welfare and security in the future than in Posch's grievance. They had no intention of quitting their jobs; the Board of Review so found; and a simple word of explanation from the employer would have terminated the strike. Apparently no one was speaking for them as they stood in a group while the dispatcher ordered them back to work. And although the dispatcher talked by telephone with his superior and the union representative and *185 despite the fact that these persons must have known the reason for the action by the men, no one saw to it that they were told about the reason for Posch's discharge. In fact, they too were discharged before the union representative reached the scene and told the "couple" of men there why Posch was dismissed. Their efforts during the remainder of the day and for the two succeeding days with the aid of the union to obtain reinstatement, is evidence of the rudderless nature of their strike and of the absence of evil intent or willful desire to injure the employer.
In the final analysis, a court ought to do no less than accept the compassionate appraisal of their conduct which was indulged in by the manager of the Trucking Division, namely, that they were "victims of circumstances." To form a more harsh judgment, particularly in view of the general judicial trend of definition of the kind of misconduct contemplated by the Legislature, would be, to borrow the language of the Wisconsin Supreme Court, to defeat unemployment benefits for
"many of the great mass of less capable industrial workers, who are in the lower income brackets and for whose benefit the act was largely designed * * *." Boynton Cab Co. v. Neubeck, supra, 237 Wis., at page 258, 296 N.W., at page 640.
Under all the circumstances, it is our view that the employees who were allowed unemployment benefits were not guilty of misconduct connected with their work within section 5 (b) of the act.
The judgment is affirmed.