46 N.J. Super. 39 (1957)
133 A.2d 663
BOARD OF REVIEW OF THE DIVISION OF EMPLOYMENT SECURITY OF THE DEPARTMENT OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, AND JERRY VOLPE, PLAINTIFFS-RESPONDENTS,
v.
KEARFOTT MANUFACTURING CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 20, 1957.
Decided July 9, 1957.
*40 Before Judges CLAPP, FRANCIS and STANTON.
Mr. Clarence F. McGovern argued the cause for plaintiff-respondent Board of Review, Division of Employment Security.
*41 Mr. Milton A. Dauber argued the cause for defendant-appellant Kearfott Manufacturing Corporation (Messrs. Carpenter, Bennett, Beggans & Morrissey, attorneys; Mr. Thomas L. Morrissey, of counsel; Mr. Burrell Ives Humphreys, on the brief).
The opinion of the court was delivered by FRANCIS, J.A.D.
Respondent Jerry Volpe was awarded unemployment compensation by the Board of Review. The propriety of the award depends upon whether the cessation of work constituted a voluntary quit or a leaving with good cause. N.J.S.A. 43:21-5(a).
Volpe, a married man with seven children, worked as a porter in the Kearfott Manufacturing Corporation plant for some years. He was a member of the union which held a collective bargaining contract with the employer. A vacancy arose in the position of oiler which paid $5 a week more wages and he applied for it. The right to upgrading was controlled by the contract referred to. His qualifications were satisfactory and he was promoted. However, there was a delay of 13 weeks in making the transfer on account of layoffs in other departments and because a number of employees were being moved around through the plant.
The union contract regulated the rights and duties of the employer and employee during a trial period following an upgrading. The employee chosen "must be available to start work on the new job not later than one (1) calendar week after date of such notification." Section 18, subsection 5(g). Then it is necessary to go through a trial period of six weeks during which he is paid either at his previous rate or the rate attached to the next lower labor grade than the new job, whichever is higher. If for any reason he is removed within one week or less, he cannot have any change in pay for time spent there. Sections 19(a) and (c). Section 19(d) is the crucial one for purposes of this proceeding:
"If at any time during the first two (2) weeks of the trial period the employee wishes to withdraw from the job, he may do so, and he will then be returned to his former job at the rate of pay applicable thereto." (Emphasis added)
*42 Also, if the company finds during this period that the employee is not qualified, he shall be so notified and "he shall then be returned to his former job." Section 19(e). (Emphasis added) And in either of the events specified in 19(d) or (e), if his former job is "then" filled by another employee, he shall be returned to it regardless of the other employee's seniority. Section 19(f). And under section 20, temporary vacancies may be filled by the company by transfer of "any" employee to the job regardless of his present labor grade or seniority, provided the employee is physically able to do the work.
Volpe started on his task as oiler on March 21. The job is a simple one; no apprenticeship is required, according to the Director of Industrial Relations. The average person "can be taken into" the job and "put to work if shown what to do." Apparently the extensiveness of the employer's operation requires the employment of a number of such workers. If one became sick, normally another oiler would replace him temporarily. So if Volpe for some physical reason became unable to continue, he would be replaced for the time being by some other oiler. There is nothing unusual about an oiler's task which would disrupt the organization if illness required his temporary replacement.
According to Volpe, the odor of the oil made him sick to his stomach and caused him to vomit. He testified that after a week, namely, on March 28, he told his superior that the work was making him ill and he asked to be returned to his old job. The superior asked him to try to "stick it out another week [just to] see what we can do." On April 3 he asked again to be restored to his old position. There is a dispute in the testimony as to the date when the first formal request for retransfer was made, the employer's witnesses fixing the time as April 3. However, the Board found that whether or not an official request for return to the old job was made on March 28, Volpe did make known "at least unofficially his dissatisfaction with the new job and his desire to return to the old one at least ten days before he left," i.e., on March 26.
*43 It appears also that on April 2 Volpe visited his family physician, Dr. Raymond L. Russamanno, about his stomach condition. He gave a history that the motor oils were causing pains in the stomach, vomiting and inability to eat his meals. Clinical examination revealed nothing objective but no tests were made. The doctor felt that probably some gastric upset was present and prescribed some powders. He had known the patient since marriage and had cared for the family, including the seven children. Volpe always worked and had never been treated for such a stomach condition before. No positive diagnosis was made. However, the doctor suggested that if the oils were bothering him, he might try giving up the work and see what would happen. No further treatment was furnished, but later in July Volpe indicated that after leaving the job he had recovered. The doctor was an impetuous witness, which seemed to disturb the chairman of the Board. Obviously he was an inexperienced witness; his testimony was largely based upon history, but he made no effort to assert a positive or even probable causal relation between the employment conditions and the stomach ailment. The sum of what he said was that there was a possible relation between the two and that he believed his patient. We are inclined to look more tolerantly on his testimony than was done in the agency. However, the Board found that employment connection with the abdominal ailment had not been proved. And in view of the conclusion reached by us, we do not feel that an independent finding of fact on this phase of the matter is necessary.
On April 4 and 5 the efforts were continued to restore Volpe to his former work as a porter. The employer's representatives, while allegedly recognizing his right to do so, obviously were not very responsive to the request. The Director of Industrial Relations said that section 19(d) of the contract meant that an upgraded employee who asked to go back to his former work would be returned at the most convenient time to the employer "so as not to disrupt production and disrupt the organization." The president of the union seemed to agree with this interpretation. Moreover, *44 the shop steward was not very helpful; he pointed out to Volpe that it took two and a half months to get the job in the first place and so he could not expect action immediately. This statement ignored entirely the unusual conditions in the plant at the time of the promotion, namely, the layoff and the shifting around of personnel in other departments.
In any event, on the proof in the record there was nothing about a forthwith return of Volpe (used here in the sense of reasonable dispatch) to his porter's job which was likely to disrupt either production or the organization. As already indicated, the oiler's work was simple and required no preliminary training; if such a worker became ill or was injured, there were others available to take over. It is certain that if an oiler during the trial period was not capable of doing the work, the employer would not tarry about replacing him. Under Section 20 of the labor agreement any employee may be transferred temporarily to fill a vacancy. With respect to the new porter who would be displaced, he had been brought in from the outside and such action must have been taken by the employer with the knowledge that Volpe had the contractual right to resume that position if he wished.
A final meeting on April 5 with the employer's representative and the shop steward did not produce any definite promise or commitment as to when in the future the transfer would be accomplished. So Volpe quit work immediately. The Board of Review found that in effect the company told him that he would be returned at its convenience. It is fairly inferable from the record, we agree, that the request for retransfer was not looked upon sympathetically and that the employer did not intend to respond with the dispatch signified by the contract and particularly by the word "then" in the pertinent section.
Upon a consideration of all the circumstances, the board concluded that the attitude and conduct of the employer constituted a breach of the bargaining contract which justified the employee in quitting the job. The opinion filed is somewhat ambiguous as to whether a violation of such an *45 agreement was considered per se as a warrant for the determination that the workman's quit, although voluntary, was for good cause within the meaning of the Unemployment Compensation Act. Appellant suggests this to be the actual view of the Board. We doubt it in view of the allowance of benefits in Beaunit Mills, Inc., v. Board of Review, Division of Employment Security, which was affirmed by this Division in 43 N.J. Super. 172 (App. Div. 1956); certification denied 23 N.J. 579 (1957). The application of that case here means that resolution of the issue of good cause in voluntary quit cases arising from the violation of a union contract depends not on the breach alone but upon whether the nature of the breach is such as to provide justification for the employee's action. It seems to us that the factual discussion by the Board points implicitly to the conclusion that the particular disregard of the agreement was of the type which provided good cause for the leaving. And if there be doubt on that score, we find on the facts that such a determination is warranted.
The voluntary termination of employment does not bar the statutory relief in all cases. That result follows only when good cause for doing so does not exist. N.J.S.A. 43:21-5(a). Manifestly, good cause may have a work connected origin or may arise from compelling personal reasons. Krauss v. A. & M. Karagheusian, Inc., 13 N.J. 447 (1953); Kempfer, "Disqualifications for Voluntary Leaving and Misconduct," 55 Yale L.J. 147, 150 (1946). In either case the worker's physical and mental condition in relation thereto is a proper subject of consideration; so, too, is the breach of an agreement by the employer to transfer him on his request as here, where the result is to hold him in a task which he does not like, which he does not feel suited for and which, by solemn compact, he is not required to keep. In such circumstances for an employer to indicate that the employee will be retained in the unwanted post for an indefinite period of time, is to impose a servitude upon him. He should not be required to accept that servitude under penalty of forfeiting unemployment benefits.
*46 The breach of contract by the company being of the type which constituted good cause for Volpe's voluntary quit, the allowance of unemployment benefits is affirmed.