61 A.3d 958

JOAN I. SILVER, APPELLANT, v. BOARD OF REVIEW,
DEPARTMENT OF LABOR AND COUNTY OF
MIDDLESEX, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 16, 2013—Decided March 21, 2013.

Before Judges ASHRAFI,[1] HAYDEN and LISA.

---

[1] Judge Ashrafi did not participate in oral argument but has participated in the decision with the consent of the parties. *See* R. 2:13–2(b).

*Alan H. Schorr* argued the cause for appellant (*Alan H. Schorr & Associates, P.C.*, attorneys; *Zachary R. Wall*, on the briefs).

*Benjamin D. Leibowitz*, Deputy County Counsel, argued the cause for respondent County of Middlesex (*Thomas F. Kelso*, County Counsel, attorney; *Mr. Leibowitz*, on the brief).

*Jeffrey S. Chiesa*, Attorney General, attorney for respondent Board of Review (*Alan C. Stephens*, Deputy Attorney General, on the statement in lieu of brief).

The opinion of the court was delivered by

LISA, J.A.D. (retired and temporarily assigned on recall).

This appeal requires us to determine whether "severe misconduct," within the meaning of New Jersey's Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.30, disqualified appellant from receiving unemployment compensation benefits. The Legislature added the term by a 2010 amendment to *N.J.S.A.* 43:21–5(b).

Appellant Joan I. Silver appeals from a final decision of the Board of Review (Board), which affirmed an Appeal Tribunal determination that she was disqualified for benefits under *N.J.S.A.* 43:21–5(b) because her discharge from employment was for severe misconduct connected with the work. Appellant argues that the Board applied an incorrect legal standard and that, under the correct standard, her conduct did not constitute "misconduct," and therefore could not constitute "severe misconduct." [2] We agree with appellant and reverse.

## I.

From February 2002 to February 2011, appellant was a full-time teacher at the Middlesex County Youth Facility. At the

---

[2] Appellant also argues that she was denied due process in connection with the Appeal Tribunal hearing. We summarily reject this argument. *See R.* 2:11–3(e)(1)(E).

beginning of classes, teachers handed out pens to the students. Each pen contained a number and was checked out by a student with the corresponding number identified. At the end of the class, the teacher was required to collect all of the pens and return them to the designated container. As each student returned a pen, the student checked off the number corresponding to the student's name. The teacher was required to account for all of the pens before the students were released from the classroom. This was important for security purposes because the pens could be used as weapons. It was not uncommon for students to steal or attempt to steal the pens. If it were discovered that a pen was missing, the teacher was required to report this immediately to a security officer.

On February 23, 2011, appellant had two classes scheduled in the morning. The pen container had places for twelve pens. At the end of her second class, appellant watched the students return their pens and check off their names. She believed every student did so. Because a security officer was anxious to move the students to their next class in order to keep up with the schedule, appellant allowed the students to leave the room before she returned the pens to the container and counted them. When she did so, she realized that one pen was missing. She immediately notified security. The missing pen was never found.

Over the years, appellant had committed this same infraction six previous times, most recently approximately six months before this incident. The record does not reveal the dates of the earlier infractions. After the sixth infraction, she was warned that if it happened one more time, she would be terminated, which she was for the February 23, 2011 infraction.

The deputy [3] determined that appellant was disqualified for benefits because her discharge was for severe misconduct. Appel-

---

[3] "Deputy" means "a representative of the Division within the New Jersey Department of Labor and Workforce Development responsible for the adminis-

lant filed an administrative appeal, and a hearing was conducted by an Appeal Tribunal, at which appellant was the only witness. The appeals examiner upheld the deputy's determination. Appellant sought further administrative review before the Board. Without discussion, the Board expressed its agreement with the Appeal Tribunal based upon the record and affirmed its decision.

## II.

Before setting forth the factual findings of the appeals examiner and the legal standard utilized for finding appellant guilty of severe misconduct, we emphasize that our discussion of the term "misconduct" applies to unemployment compensation law. We are not defining the scope of "misconduct," "good cause," or other standard of behavior that may be relevant to termination of employment or other disciplinary action in public or private employment disputes. We deem some historical information necessary as the analytical basis for determining the correct legal standard by which "misconduct" and "severe misconduct" should be defined.

From its inception in 1936 until 2010, New Jersey's Unemployment Compensation Law has provided for disqualification for benefits for employees discharged for "misconduct" or "gross misconduct" connected with the work. *N.J.S.A.* 43:21–5(b); *see L.* 1936, *c.* 270, § 5. The statute defines "gross misconduct" as "an act punishable as a crime of the first, second, third or fourth degree," but it does not define the term "misconduct." *Ibid.* Appropriately, the sanctions for gross misconduct are greater than for simple misconduct. *Ibid.*

In 2010, the Legislature added a third category in section 5(b), "severe misconduct." *L.* 2010, *c.* 37, § 2, eff. July 1, 2010. As we will explain, this was intended as an intermediate form of misconduct, requiring greater culpability than simple misconduct, but

---

tration of the Unemployment Insurance Benefit Payment Program." *N.J.A.C.* 12:17–2.1.

less than gross misconduct, and with an intermediate level of disqualification from collecting unemployment benefits.[4] The amendatory provision does not define severe misconduct, but contains a non-exclusive list of examples. *See N.J.S.A.* 43:21–5(b).

In 1956, our Supreme Court held that employees were guilty of misconduct for engaging in a work stoppage, in violation of a no-strike clause in their collective bargaining agreement, which provided that the employer shall immediately discharge any employee in violation of the clause. *Bogue Elect. Co. v. Bd. of Review,* 21 *N.J.* 431, 433–34, 122 *A.*2d 615 (1956). Without attempting to define "misconduct" broadly, the Court held that a deliberate breach of the collective bargaining agreement could not be deemed a circumstance causing involuntary unemployment, the hazard intended by the Legislature to be protected against, and thus, within the spirit and policy of the unemployment law, it constituted misconduct. *Id.* at 436, 122 *A.*2d 615.

A few months later, a panel of this court was confronted with a similar situation, in which employees were fired as a result of a work stoppage, but in which the collective bargaining agreement did not contain a no-strike provision. *Beaunit Mills, Inc. v. Bd. of Review,* 43 *N.J.Super.* 172, 176–80, 128 *A.*2d 20 (App.Div.1956), *certif. denied,* 23 *N.J.* 579, 130 *A.*2d 89 (1957). Because of that material factual distinction, the panel was required to define "misconduct" within the meaning of the unemployment law. It did so thusly:

What does the statutory misconduct signify? Obviously it cannot mean "mere mistakes, errors in judgment or in the exercise of discretion, or minor but casual or

---

[4] "Misconduct" results in disqualification for the week that the employee was discharged and seven additional weeks. *N.J.S.A.* 43:21–5(b). To qualify for unemployment compensation after discharge for "severe misconduct," the employee must first become reemployed for a period of at least four weeks and earn at least six times the employee's weekly unemployment benefit rate. *Ibid.* "Gross misconduct" results in no benefits from the account of the employer against whom the gross misconduct occurred and requires at least eight weeks of new employment and wages totaling at least ten times the weekly benefit rate before the claimant can collect unemployment compensation. *Ibid.*

unintentional carelessness or negligence, and similar minor peccadilloes." It cannot mean mere inefficiency, unsatisfactory conduct, failure of performance as the result of inability or incapacity, inadvertence in isolated instances, or good faith errors of judgment. *Boynton Cab Co. v. Neubeck,* 237 *Wis.* 249, 296 *N.W.* 636 (1941); *Kempfer, "Disqualifications for Voluntary Leaving & Misconduct,"* 55 *Yale Law J.* 147, 162–166 (1945). In our opinion, the statement in *48 Am.Jur., Social Security, Unemployment Compensation, etc.,* § 38 at 541 (1943), suggests the fair intendment of the statute:

> "Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or willful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or reoccurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer."

[*Id.* at 182–83.]

Applying those principles, we held that, because the employees "were engaged in a concerted activity in good faith for their mutual aid and protection," and with an "absence of evil intent or willful desire to injure the employer," under all of the circumstances, the employees were not guilty of misconduct connected with the work within the meaning of section 5(b). *Id.* at 183, 185.

Subsequent case law, although sparse, has made clear that the *Beaunit Mills* standard for defining misconduct is not limited to a literal and isolated reading of the *Am.Jur.* passage quoted above. The definition also includes the discussion in *Beaunit Mills* preceding the *Am.Jur.* passage we have also quoted.

In *Demech v. Board of Review,* 167 *N.J.Super.* 35, 400 *A.*2d 502 (App.Div.1979), we considered conduct in which a supermarket employee threw a twenty-five pound meat roast at a co-employee out of frustration and anger caused by his inappropriate conduct toward her. *Id.* at 36–38, 400 *A.*2d 502. The Board found that the employee's termination for that incident constituted misconduct because it "was a disregard of the standards of behavior which the employer has a right to expect of its employees." *Id.* at 38, 400 *A.*2d 502.

While that finding might have satisfied the *Am.Jur.* definition cited in *Beaunit Mills,* we disagreed and found that the employee's conduct did not constitute misconduct. *Id.* at 38–39, 400 *A.*2d 502. Citing *Beaunit Mills,* we explained that "[j]udicial attempts to imbue the term with substantive meaning have ... insisted upon the ingredients of wilfulness, deliberateness and intention if an employee's act is to qualify as misconduct." *Ibid.* Because the employee's conduct was provoked by the co-employee, was unthinking and spontaneous, and was not intended to and did not cause injury to the co-employee, it did not qualify as misconduct under the *Beaunit Mills* standard. *Ibid.* We concluded: "All that the statute undertakes to penalize is deliberate and willful disregard of standards of conduct an employer has a right to expect." *Id.* at 41, 400 *A.*2d 502.

The critical distinction between intentional and deliberate conduct on the one hand and negligent or inadvertent conduct on the other was brought into sharp focus in a case decided by a divided panel of this court in *Smith v. Board of Review,* 281 *N.J.Super.* 426, 658 *A.*2d 310 (App.Div.1995). In that case, a hospital orderly was fired for misconduct because he brought food to a pre-surgery patient, contrary to oral instructions from a nurse that he not do so. *Id.* at 428, 658 *A.*2d 310. The Board found this conduct to be "a willful disregard of the employer's best interest," thus constituting misconduct. *Id.* at 430, 658 *A.*2d 310.

The majority agreed, and, applying the *Beaunit Mills* standard, held that the record supported the Board's finding of a deliberate refusal to comply with the employer's work rules. *Id.* at 431–33, 658 *A.*2d 310. The dissenting member also applied the *Beaunit Mills* standard, but would have reversed because, in his view, the evidence was not sufficient to support a willful disregard of the employer's policies, but only negligent conduct. *Id.* at 438, 658 *A.*2d 310 (Brochin, J.A.D., dissenting).

In *Parks v. Board of Review,* 405 *N.J.Super.* 252, 255, 963 *A.*2d 1245 (App.Div.2009), we again emphasized the need for deliberate or intentional conduct, this time for an employee who was fired

because of excessive absenteeism, based on four absences. Although all of the absences were occasioned by family illnesses or emergencies, the Board found that misconduct was established because, after being warned, the employee's further absenteeism constituted a disregard of the standards of behavior which the employer had a right to expect. *Id.* at 255, 963 *A.*2d 1245. Again, this could satisfy one of the disjunctive alternatives set forth in the *Am.Jur.* passage quoted in *Beaunit Mills.*

However, we discussed the *Beaunit Mills* standard in broader terms, noting that misconduct "must be more than simply inadequate job performance that provides good cause for discharge." *Id.* at 254, 963 *A.*2d 1245. After quoting the *Am.Jur.* passage and citing *Beaunit Mills,* we stated: "Thus, disqualification under *N.J.S.A.* 43:21–5(b) is warranted only when the employee's conduct that resulted in his or her discharge had 'the ingredients of wilfulness, deliberateness and intention.'" *Ibid.* (quoting *Demech, supra,* 167 *N.J.Super.* at 38, 400 *A.*2d 502) (citing *Smith, supra,* 281 *N.J.Super.* at 433–34, 658 *A.*2d 310). We therefore concluded that, because the employee's absences were the result of excusable circumstances, they could not meet the *Beaunit Mills* standard of deliberate or intentional violations of the employer's rules. *Id.* at 256, 963 *A.*2d 1245.

In the only other reported decisions of which we are aware dealing with the definition of misconduct, intentional acts of insubordination were deemed to constitute misconduct under section 5(b). *Borowinski v. Bd. of Review,* 346 *N.J.Super.* 242, 246, 787 *A.*2d 902 (App.Div.2001); *Broderick v. Bd. of Review,* 133 *N.J.Super.* 30, 31, 335 *A.*2d 67 (App.Div.1975).

■ Apparently mindful of this line of cases, the Department of Labor and Workforce Development (Department) promulgated a rule in 2003 defining misconduct as follows:

> For an act to constitute misconduct, it must be improper, intentional, connected with one's work, malicious, and within the individual's control, and is either a deliberate violation of the employer's rules or a disregard of standards of behavior which the employer has the right to expect of an employee.

[*N.J.A.C.* 12:17–10.2(a).[5]]

By its plain terms, this rule prescribes a two-prong standard to establish misconduct. First, the conduct must be improper, intentional, connected with the work, malicious, *and* within the employee's control. Second, the conduct must *also* be either a deliberate violation of the employer's rules or a disregard of the standards of behavior which the employer has the right to expect.

This test is more stringent than the *Am.Jur.* passage quoted in *Beaunit Mills.* It incorporates the other features of the *Beaunit Mills* analysis, as further elucidated and reiterated in subsequent case law. And, *Beaunit Mills* built upon a foundation laid down by the Supreme Court in *Bogue,* the rationale of which hinged upon the incongruity of allowing benefits to "a group of employees [who] *deliberately* violate a [clearly important] basic provision of a collective bargaining agreement." *Bogue, supra,* 21 *N.J.* at 436, 122 *A.*2d 615 (emphasis added).

Because *N.J.A.C.* 12:17–10.2(a) is the agency's own rule, it constitutes the controlling authority for disposition of claims based on misconduct. *Besler & Co. v. Bradley,* 361 *N.J.Super.* 168, 173–74, 824 *A.*2d 289 (App.Div.2003); *Venuti v. Cape May Cnty. Bd. of Appeals,* 231 *N.J.Super.* 546, 554–55, 555 *A.*2d 1175 (App.Div. 1989); *see also N.J.A.C.* 12:17–1.1(c) (stating that the provisions of this chapter shall be applicable to all employers and to all workers who file unemployment insurance claims).

The 2010 amendment to *N.J.S.A.* 43:21–5(b) added a new severe misconduct provision, placed between the paragraphs dealing with simple misconduct and gross misconduct. The first sentence of the new paragraph prescribed the disqualification penalties applicable for an employee suspended or discharged for severe misconduct. No definition was given for severe misconduct, but the second and final sentence of the new paragraph gave examples:

---

[5] This rule has been in effect since July 7, 2003. *See* 35 *N.J.R.* 1527(a); 35 *N.J.R.* 3874(b). It amended the rule as originally promulgated on June 1, 1998. *See* 29 *N.J.R.* 5158(a); 30 *N.J.R.* 2027(a).

Examples of severe misconduct include, but are not necessarily limited to, the following: repeated violations of an employer's rule or policy, repeated lateness or absences after a written warning by an employer, falsification of records, physical assault or threats that do not constitute gross misconduct as defined in this section, misuse of benefits, misuse of sick time, abuse of leave, theft of company property, excessive use of intoxicants or drugs on work premises, theft of time, or where the behavior is malicious and deliberate but is not considered gross misconduct as defined in this section.

[*N.J.S.A.* 43:21–5(b), as amended by *L.* 2010, *c.* 37, § 2, eff. July 1, 2010.]

This amendment was not part of the original bill passed by the Legislature. It was added to that bill in response to Governor Chris Christie's conditional veto message, which included the following:

It is time for the State to achieve comprehensive reform in the State's unemployment compensation system in order to bring the [Unemployment Insurance Trust F]und back to solvency in a fair and balanced way. There is a broad consensus that the current statutory framework for our treatment of misconduct cases is not in line with the practices of a majority of other states. Under the current statutory structure about 90 percent of the misconduct cases have the same penalty without regard to the individual's level of misconduct. This treatment is not balanced. I am advised that by redefining "misconduct" by carving out a "severe misconduct" tier, as well as creating a more proportional unemployment benefit penalty structure, the individuals seeking unemployment insurance would be treated more equitably, and the Unemployment Insurance Trust Fund would realize a significant savings each year. In this regard, I believe it would be equitable to reform this section of the law to ensure that the penalty for the misconduct is treated proportionately to the level of misconduct.

Moreover, I will advise the Department of Labor & Workforce Development to change any regulations that are not consistent with the above recommendation, and, also, to propose appropriate regulations to require that an employer provide written documentation to show that the employee's actions constitute either misconduct, severe misconduct, or gross misconduct.

[Governor's Conditional Veto Message, S1813, *L.* 2010, *c.* 37.]

The Department has not yet adopted new regulations to distinguish simple misconduct from severe misconduct. It first made an effort to do so with a proposed rule amendment issued November 15, 2010. 42 *N.J.R.* 2712(a). However, the proposed rule was never adopted and it expired, as referenced by the second effort, which is now underway, by virtue of a different proposed rule

amendment issued January 7, 2013. 45 *N.J.R.* 19(a).[6]

Until any new definition is promulgated by rule, the definition contained in the present version of *N.J.A.C.* 12:17–10.2(a) controls, except to the extent it is superseded by the 2010 amendment of the statute. The regulation, of course, pertains only to simple misconduct. However, it seems to us fundamental that the term "misconduct," should have the same meaning throughout *N.J.S.A.* 43:21–5(b) and its implementing regulation. *Commerce Bancorp, Inc. v. InterArch, Inc.*, 417 *N.J.Super.* 329, 336–37, 9 *A.*3d 1056 (App.Div.2010).

██ Two of the examples of severe misconduct listed in the 2010 amendment describe, if read literally, conduct that would not necessarily be deliberate, intentional, or malicious ("repeated violations of an employer's rule or policy," and "repeated lateness or absences after a written warning"). However, in light of the history we have described, it is obvious that the Governor and Legislature intended to create severe misconduct as a gap-filler between simple misconduct and gross misconduct. It would make no sense to allow for conduct with a lower level of culpability (such as mere inadvertence or negligence) to qualify as severe misconduct and carry with it a harsher sanction than simple misconduct. Such a result would be absurd and clearly contrary to the legislative intent, as expressly set forth in the Governor's Conditional Veto Message. S1813, *L.* 2010, *c.* 37.

Therefore, we must construe these two examples of severe misconduct as requiring acts done intentionally, deliberately, and with malice. Because these two examples of severe misconduct

---

[6] Even prior to the 2010 amendment, the Department proposed an amendment to *N.J.A.C.* 12:17–10.2 which would have substituted for the current version the *Am.Jur.* passage quoted in *Beaunit Mills.* *See* 41 *N.J.R.* 3781(a) (issued October 5, 2009). The proposal stated: "At some time during the history of the regulations between 1956 and the present, the Department evidently sought to paraphrase the court's holding in *Beaunit Mills.* However, in doing so, it does appear that some of the meaning of the court's definition for the term 'misconduct' was lost." *Ibid.* The proposed rule amendment was not adopted.

require repeated violations, such a construction would render the conduct more egregious than simple misconduct, which could result from a single such violation committed intentionally and with malice. We understand "intentional" and "malicious" as used in the regulation to include deliberate disregard of the employer's rules or policies, or deliberate disregard of the standards of behavior that the employer has the right to expect of an employee. This interpretation comports with the amended statutory scheme, which lists three levels of misconduct, each dependent upon the employee's relative degree of culpability.

We do not know what amendatory rules the Department will ultimately adopt. The rulemaking process is now ongoing. Whatever newly promulgated rules may apply to future cases, they will have no applicability to this case.

## III.

Appellant does not dispute that her conduct, after the prior infractions and warning, provided her employer with just cause to terminate her for poor work performance. The issue is whether she committed misconduct within the meaning of the unemployment law. Appellant has at all times candidly admitted that the missing pen was her fault and a result of her mistake. At the Appeal Tribunal hearing, she made this statement at the end of her testimony:

> I want you to know that was an honest mistake on my part that I would never, ever ... [fail] to report anything.... I would never consider this misconduct and I always respected every incident regardless of how minor they may seem and that I had neglected to follow rules and procedures.... I counted my pens, checking and double checking before and after each class if I had the time which I usually did and I'm also the art teacher and I had more materials than other teacher[s] there. This has happened to other teachers also. I had pens, pencils, markers and other things and I also did the testing and I had pens there Tuesday and Thursday mornings. The truth is that despite my precautions ... [the students] take advantage of me and they were faster than me and they found ways to distract me. I mean these are criminals.

The appeals examiner set forth as the controlling definition of misconduct the *Am.Jur.* passage quoted in *Beaunit Mills.* The appeals examiner then concluded:

> The claimant's action in violating procedure, which was the cause of the discharge, was a disregard of the standards of behavior which the employer has a right to expect of his employees and constitutes misconduct connected with the work. In this case at hand, while there is little doubt the claimant was a conscientious employee, her action of failing to ensure she had all twelve (12) pens before releasing the class was a violation of the established procedures in place. The claimant possibly did not have control over a pen she did not issue to a student, but it was within her control to comply with all aspects of the employer's procedures. She was aware she should have accounted for all pens before releasing the children and her failure to do so rose to a level of misconduct as defined above. Additionally, as the claimant was on a final warning for the same infraction, her actions constitute severe misconduct connected to the work. Therefore, the claimant is disqualified for benefits under *N.J.S.A.* 43:21–5(b), as of 02/20/2011 as she was discharged for severe misconduct connected with the work.

Nowhere in the decision of the Appeal Tribunal is there any mention of *N.J.A.C.* 12:17–10.2(a), and its requirement that the conduct be intentional, deliberate, and malicious. That regulation is also conspicuously absent from the employer's appellate brief and the statement in lieu of brief filed on behalf of the Board in this appeal.

 The factual findings of the appeals examiner, adopted by the Board, do not include a finding of intentional or deliberate conduct or malicious intent. Nor did the appeals examiner find that appellant intentionally or deliberately disregarded the employer's rule for collecting pens after a class. Indeed, the record would not support such a finding. The repetitive violation of a rule, policy, or standard of conduct may justify a reasonable inference that the employee's disregard was deliberate and in that sense malicious. However, appellant explained the circumstances of her failure to account for all the pens, and the employer did not refute her assertion that she was trying to comply with the rule. She was simply unable to do so. It is clear to us, as it apparently was to the appeals examiner and the Board, that appellant's conduct was a result of negligence or inadvertence, not intentional or deliberate disregard of the employer's rule.

To find misconduct, the agency relied on the portion of the *Beaunit Mills* standard contained in the *Am.Jur.* passage. In our view, that fragmented approach has never been what was intended by *Beaunit Mills,* as described in our subsequent opinions, and reliance on it constituted legal error. Under the correct *Beaunit Mills* analysis, appellant's conduct did not constitute misconduct because it lacked the requisite elements of wilfulness, deliberateness, intention, and malice. More important, her conduct did not satisfy the agency's own definition of misconduct, which is controlling, and which, in our view, appears to have been designed to express the entire *Beaunit Mills* standard.

As we have stated, appellant was found to have committed not only misconduct, but severe misconduct. Because we have concluded that, under the controlling legal definition, there was no misconduct, of necessity there could be no severe misconduct.

We recognize our limited standard of review of a final agency decision. We will not upset such a decision unless it was arbitrary, capricious or unreasonable, or violated legislative policies expressed or implied in the act governing the agency. *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). As a reviewing court, while we respect an agency's expertise, ultimately the interpretation of statutes and regulations is a judicial, not administrative, function and we are not bound by the agency's interpretation. *Mayflower Secs. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973).

In this case, the Board has ignored its own regulation defining "misconduct." Instead, it applied its view of the *Beaunit Mills* standard, which, for the reasons we have explained, was erroneous. We therefore conclude that the legal error underpinning the Board's action rendered its action arbitrary and contrary to the applicable statutory and regulatory provisions.

Reversed.